**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| SUPERIOR AIR CHARTER, LLC,[1] | Case No.  20-11007 (CSS) |
| Debtor. | |

**THE DEBTOR AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
FIRST AMENDED JOINT COMBINED DISCLOSURE STATEMENT
AND CHAPTER 11 PLAN OF REORGANIZATION**

**BAYARD, P.A.**

Evan T. Miller (No. 5364)
Daniel N. Brogan (No. 5723)
Gregory J. Flasser (No. 6154)
Sophie E. Macon (No. 6562)
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:emiller@bayardlaw.com
dbrogan@bayardlaw.com
gflasser@bayardlaw.com
smacon@bayardlaw.com

*Counsel to the Debtor and Debtor in
Possession*

**TROUTMAN PEPPER HAMILTON
SANDERS LLP**

David B. Stratton (No. 960)
Evelyn J. Meltzer (No. 4581)
Marcy J. McLaughlin Smith (No. 6184)
Hercules Plaza
1313 Market Street, Suite 5100
Wilmington, DE 19899-1709
Email: david.stratton@troutman.com
evelyn.meltzer@troutman.com
marcy.smith@troutman.com

*Counsel to the Official committee of
Unsecured Creditors*

---

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, is as follows: Superior Air Charter, LLC (2081).  The mailing address for the Debtor, solely for purposes of notices and communications, is: 1341 W. Mockingbird Lane, Suite 600E, Dallas, Texas 75247.

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................2

II.    DEFINITIONS AND CONSTRUCTION OF TERMS .....................................................3

    A.    Definitions.........................................................................................................3

    B.    Interpretation; Application of Definitions and Rules of Construction...................13

III.    BACKGROUND AND DISCLOSURES...........................................................................14

    A.    General Background ......................................................................................14

        1.    Debtor Overview and Business Operations ...............................14

        2.    Organizational Structure ..........................................................15

        3.    Secured Debt.............................................................................15

        4.    Unsecured Debt.........................................................................15

        5.    Equity Interests ........................................................................16

        6.    Relationships with Non-Debtor Affiliates .................................16

        7.    Events Leading to the Chapter 11 Case and Goals
            During the Chapter 11 Case......................................................17

    B.    The Chapter 11 Case......................................................................................18

        1.    First Day Motions and Orders (other than the DIP
            Motion and DIP Financing Order)............................................19

        2.    Post-Petition Financing.............................................................19

        3.    Employment and Compensation of Debtor's Professionals
             and Advisors ...........................................................................20

        4.    Appointment of Committee ......................................................20

        5.    Claims Process and Bar Date....................................................20

            a.    Section 341(a) Meeting of Creditors....................................20

            b.    Schedules and Statements .................................................20

i

# TABLE OF CONTENTS

**Page**

        c.  Bar Date ...................................................................................20

    6.      Post-petition Sale Efforts........................................................20

    7.      Other Significant Motions in the Bankruptcy Case...............................21

    8.      Chapter 11 Plan Terms ...........................................................21

  C.     Certain Federal Income Tax Consequences........................................23

  D.     Alternative Plan ................................................................ 25

  E.     Best Interests Test and Liquidation Analysis.......................................25

  F.     Releases by the Debtor and Third Parties .........................................26

  G.     Administrative and Priority Claim Reserve ........................................26

IV.    SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES ......26

  A.     Summary of Treatment of Claims and Equity Interests and
       Estimated Recoveries ...........................................................26

V.    CONFIRMATION AND VOTING PROCEDURES.......................................27

  A.     Confirmation Procedure .........................................................27

    1.      Confirmation Hearing ...........................................................27

    2.      Procedure for Objections ........................................................28

    3.      Requirements for Confirmation .................................................28

    4.      Classification of Claims and Equity Interests ...........................................29

  B.     Voting Procedure ...............................................................29

    1.      Impaired Claims or Equity Interests ............................................29

    2.      Feasibility......................................................................29

    3.      Eligibility to Vote on the Combined Disclosure Statement and Plan........30

    4.      Solicitation Notice ............................................................ 30

# TABLE OF CONTENTS

**Page**

      5.       Procedure/Voting Deadlines ........................................................... 30

      6.       Acceptance of the Combined Disclosure Statement and Plan .................30

      7.       Elimination of Vacant Classes ..................................................31

VI.    TREATMENT OF UNCLASSIFIED CLAIMS ................................................31

    A.     Administrative Expense Claims .................................................. 31

    B.     Priority Tax Claims .............................................................. 31

    C.     Professional Claims ...............................................................32

      1.       Payment of Professional Claims .............................................32

      2.       Professional Fee Reserve .................................................... 32

      3.       Allocation and Estimation of Professional Claims ....................................32

      4.       Timing for Filing Professional Claims .......................................32

      5.       Post-Effective Date Fees and Expenses .....................................33

    D.     Payment of Statutory Fees ...................................................... 33

VII.   CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS;
ESTIMATED RECOVERIES ...........................................................33

VIII.  TREATMENT OF CLAIMS AND EQUITY INTERESTS ...........................................34

    A.     Treatment of Claims ............................................................34

      1.       Class 1—DIP Facility Claims .................................................34

          a.      Classification ............................................................34

          b.      Impairment and Voting ................................................34

          c.      Treatment ............................................................ 34

      2.       Class 2—Other Secured Claims.................................................35

          a.      Classification ............................................................35

# TABLE OF CONTENTS

**Page**

|  |  |  |  |
|---|---|---|---|
|  | b. | Impairment and Voting | 35 |
|  | c. | Treatment | 35 |
| 3. | | Class 3—Other Priority Claims | 35 |
|  | a. | Classification | 35 |
|  | b. | Impairment and Voting | 35 |
|  | c. | Treatment | 35 |
| 4. | | Class 4—General Unsecured Claims | 35 |
|  | a. | Classification | 35 |
|  | b. | Impairment and Voting | 36 |
|  | c. | Treatment | 36 |
| 5. | | Class 5—SuiteKey Claims | 36 |
|  | a. | Classification | 36 |
|  | b. | Impairment and Voting | 36 |
|  | c. | Treatment | 36 |
| 6. | | Class 6—Subordinated Claims | 38 |
|  | a. | Classification | 38 |
|  | b. | Impairment and Voting | 38 |
|  | c. | Treatment | 38 |
| 7. | | Class 7—Existing Equity Interests | 38 |
|  | a. | Classification | 38 |
|  | b. | Impairment and Voting | 39 |
|  | c. | Treatment | 39 |

# TABLE OF CONTENTS

**Page**

B.     Modification of Treatment of Claims and Equity Interests ....................................39

C.     Cramdown and No Unfair Discrimination...........................................................39

IX.     PROVISIONS REGARDING THE GUC TRUSTEE.......................................................39

A.     Appointment of the GUC Trustee.........................................................................39

B.     Rights and Powers of the GUC Trustee ................................................................40

C.     Post Effective Date Expenses of the GUC Trustee................................................40

D.     GUC Trust Agreement.......................................................................................... 40

X.     PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN ......................................................................41

A.     Method of Payment ..............................................................................................41

B.     Objections to and Resolution of Claims ..............................................................41

C.     Claims Objection Deadline................................................................................... 41

D.     Late Claims and Amendments to Claims After the Confirmation Date .............. 41

E.     No Distribution Pending Allowance .................................................................... 41

F.     Estimation ............................................................................................................ 41

G.     Claims Reserve.....................................................................................................42

H.     Timing of Distributions ....................................................................................... 42

I.     Delivery of Distributions ..................................................................................... 42

J.     Unclaimed Distributions ...................................................................................... 43

K.     *De Minimis* Distributions ................................................................................... 43

L.     Setoff and Recoupment ....................................................................................... 43

M.     Postpetition Interest ............................................................................................. 43

N.     Allocation of Distributions Between Principal and Interest .................................43

# TABLE OF CONTENTS

**Page**

O.    No Penalty Claims ...........................................................................44

P.    No Creditor to Receive More than Payment in Full ..............................44

Q.    Escheatment ....................................................................................44

R.    Remaining Available Cash ................................................................44

S.    Compliance with Tax Requirements...................................................44

XI.    IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED
DISCLOSURE STATEMENT AND PLAN ......................................................45

    A.    Means for Implementation of the Combined Disclosure Statement and Plan .......45

        1.    Funding of Liabilities and Distributions....................................45

        2.    Corporate Action; Effectuating Documents; Further Transactions ...........45

        3.    Direction to Parties ..............................................................45

        4.    Title to Accounts.................................................................45

        5.    Exemption from Certain Taxes...............................................46

    B.    Provisions Regarding Corporate Governance of the Reorganized Debtor ...........46

        1.    Retention of Membership Interests in the Reorganized Debtor...............46

        2.    Management of the Reorganized Debtor....................................46

        3.    Powers of Officers...............................................................46

    C.    Provisions Regarding Means of Implementation, Voting, Distributions,
and Resolution of Disputed Claims ....................................................47

        1.    General Settlement of Claims .................................................47

        2.    Avoidance Actions...............................................................47

        3.    Restructuring Transactions ....................................................47

        4.    Approval and Authorization of Corporate and Company Action.............47

# TABLE OF CONTENTS

**Page**

      5.      Effectuating Documents; Further Transactions ..........................................48

      6.      Reorganized Debtor Operating Agreement .................................................48

      7.      Cancellation of Securities and Agreements ...............................................48

      8.      Distributions in Respect of Allowed Claims .............................................49

   D.      Effect of Confirmation of the Plan...............................................................49

      1.      Continued Entity Existence.........................................................................49

      2.      Vesting of Assets .......................................................................................49

      3.      Preservation of Causes of Action................................................................49

      4.      Discharge of the Debtor ..............................................................................50

XII.     EXCULPATION, RELEASES AND INJUNCTIONS ..............................................50

   A.      Exculpation ................................................................................................50

   B.      Releases by the Debtor................................................................................51

   C.      Third Party Releases ...................................................................................51

   D.      Injunctions Relating to Releases.................................................................51

   E.      Injunctions to Protect Estate Assets............................................................52

XIII.    EXECUTORY CONTRACTS ...............................................................................52

   A.      Executory Contracts ...................................................................................52

# TABLE OF CONTENTS

**Page**

1.     Assumption and Rejection of Executory Contracts ...................................52

2.     Rejection Damage Claims and Rejection Bar Date ...................................53

3.     Restrictions on Assignment Void .................................................................53

4.     Benefit Plans .................................................................................................53

5.     Workers' Compensation and Insurance Programs ....................................54

B.     Debtor's Insurance Policies ..................................................................................54

XIV.   CONDITIONS TO CONFIRMATION AND THE EFFECTIVE DATE ................... 54

A.     Conditions Precedent to Confirmation..................................................................54

B.     Conditions Precedent to the Effective Date .........................................................55

C.     Establishing the Effective Date.............................................................................55

D.     Effect of Failure of Conditions ............................................................................55

E.     Waiver of Conditions to Confirmation and Effective Date ..................................55

XV.    RETENTION OF JURISDICTION....................................................................................55

XVI.   MISCELLANEOUS PROVISIONS...................................................................................57

A.     Books and Records ...............................................................................................57

B.     Termination of Injunctions or Stays ....................................................................57

C.     Amendment or Modification of the Combined Disclosure Statement and Plan....58

D.     Severability .........................................................................................................58

E.     Revocation or Withdrawal of the Combined Disclosure Statement and Plan .......58

F.     Binding Effect....................................................................................................... 58

G.     Notices .................................................................................................................58

H.     Governing Law ..................................................................................................... 59

# TABLE OF CONTENTS

**Page**

I.      Withholding and Reporting Requirements .............................................................59

J.      2002 Service List...................................................................................................59

K.      Headings ................................................................................................................60

L.      Exhibits/Schedules................................................................................................60

M.     Filing of Additional Documents ...........................................................................60

N.      No Admissions....................................................................................................... 60

O.      Successors and Assigns ......................................................................................... 60

P.      Reservation of Rights ........................................................................................... 60

Q.      Implementation......................................................................................................60

R.      Inconsistency .........................................................................................................61

S.      Dissolution of the Committee................................................................................ 61

T.      Termination of the GUC Trustee........................................................................... 61

U.      Compromise of Controversies ..............................................................................61

V.      Request for Expedited Determination of Taxes....................................................62

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

## I.    INTRODUCTION[2]

The Debtor and Committee hereby jointly propose this Combined Disclosure Statement and Plan under sections 1125 and 1129 of the Bankruptcy Code. The Debtor and the Committee are the proponents of the Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code.

In connection with the Debtor's efforts to sell its assets, on April 28, 2020, it commenced this Bankruptcy Case. At the outset of this Chapter 11 Case, the Debtor Filed the Bidding Procedures Motion. The Bidding Procedures Motion initiated a marketing process with the DIP Lenders serving as the proposed stalking horse bidder, which was designed to solicit interest in bids and culminate in an auction in an effort to maximize the value of the Debtor's assets for the benefit of the Debtor, its Estate and all parties-in-interest.

Following the appointment of the Committee on May 12, 2020, however, the Debtor, the Committee, and the DIP Lenders, which are Non-Debtor Affiliates of the Debtor, engaged in robust negotiations about the nature and terms of a transaction that would provide the maximum benefit to the Debtor's estate and creditors, including holders of SuiteKey Claims, the largest group of unsecured creditors. As a result of those negotiations, the Debtor, with agreement of the Committee appointed in this case, determined to pivot from the marketing process proposed by the Bidding Procedures Motion and proceed instead with a reorganization under the terms of this Combined Plan and Disclosure Statement.

Implementation of the reorganization through this method allows the Debtor and its Estate to achieve a number of benefits for the Debtor's creditors, including: (i) saving significant costs that would have accrued in connection with the running of a lengthy public auction process, with no guarantee that the auction process would result in a higher or better offer because of the extent to which the size of the DIP Credit Facility surpasses the value of the Debtor's Assets; (ii) shortening the duration of this Chapter 11 Case, and thus curtailing the continued accumulation of administrative expenses to the estate and increasing recoveries to unsecured creditors;[3] and (iii) providing SuiteKey Claimants in particular with a unique means of realizing value from their prepetition notional balances with the Debtor, as described more fully below.

The Combined Disclosure Statement and Plan constitutes a chapter 11 plan of reorganization for the Debtor. The Combined Disclosure Statement and Plan provides that on the Effective Date (i) the GUC Trust Proceeds (including the undrawn balance of the Debtor's DIP Commitment and a reconciliation payment to be made by one of the DIP Lenders) as contributed by the DIP Lenders shall automatically vest in the GUC Trust free and clear of all Claims, Liens and interests; and (B) except for the GUC Trust Proceeds, all of the property and assets of the Debtor—including, among others, (i) the Purchased and Financed Aircraft; (ii) the Part 135 Operating Certificate; (iii) the Debtor's customer list; (iv) the Debtor's intellectual

---

[2] All capitalized terms not defined in this introduction shall have the same meanings set forth in Article II of the Combined Disclosure Statement and Plan.

[3] This is also a primary reason for seeking resolution of these cases through a combined plan and disclosure statement, rather than as two separate, lengthy documents.

property and trademarks; and (v) all Causes of Action, including those under Chapter 5 of the Bankruptcy Code (which Chapter 5 causes of action shall be waived)—shall be revested in the Reorganized Debtor, free and clear of all Liens, Claims and interests.  At the direction of the DIP Lenders for the consideration provided to implement the Combined Plan and Disclosure Statement, JSI's Equity Interests in the Debtor will be reinstated in full in the Reorganized Debtor.  There are two impaired classes identified in the Combined Disclosure Statement and Plan that are entitled to vote to accept the Combined Disclosure Statement and Plan: (i) Class 4 General Unsecured Claims and (ii) Class 5 General Unsecured SuiteKey Customer Claims. Class 4 and Class 5 are the only Classes entitled to vote on the Combined Disclosure Statement and Plan.

The Combined Disclosure Statement and Plan provides that each Holder of a General Unsecured Claim shall receive its *Pro Rata* share of the proceeds of the GUC Trust Proceeds as set forth in this Combined Disclosure Statement.  SuiteKey Claimants will be permitted to choose between treatment under Class 4 (General Unsecured Claims) or Class 5 (SuiteKey Claims).  Class 5 SuiteKey Claims will receive certain Credits towards future flights hosted by Delux Public Charter, doing business as JSX, as outlined in Article VIII.A.5 of the Combined Disclosure Statement and Plan.  One of the DIP Lenders, JetSuiteX, maintains $16 million of claims against the Debtor on the basis of unsecured demand notes, but has agreed to subordinate the same to other unsecured creditors, which likewise inures to the benefit of the Debtor's creditors.  Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable and at various intervals thereafter.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XVI.C of the Combined Disclosure Statement and Plan, the Debtor expressly reserves the right to alter, amend or modify the Combined Disclosure Statement and Plan, one or more times, before its substantial consummation.

## II.    DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.    "**503(b)(9) Claim**" means any Claim against the Debtor under section 503(b)(9) of the Bankruptcy Code for the value of goods sold to the Debtor in the ordinary course of business and received by the Debtor within twenty (20) days before the Filing Date.

2.    "**Administrative and Priority Claim Reserve**" means a reserve or escrow established for the benefit of the Holders of Allowed Administrative Expense Claims, Allowed Other Priority Claims, and Allowed Priority Tax Claims which amount shall be the amount necessary to satisfy in full Allowed Administrative Expense Claims, Allowed Other Priority Claims and Allowed Priority Tax Claims.

3.     **"Administrative Expense Bar Date"** means the first Business Day that is thirty (30) calendar days after the Effective Date for Filing requests for allowance and payment of Administrative Expense Claims arising in the time period between the Filing Date and the Effective Date.

4.     **"Administrative Expense Claim"** means any right to payment constituting actual and necessary costs or expenses of administration of the Chapter 11 Case under sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estate, (b) 503(b)(9) Claims, and (c) any fees or charges assessed against the Estate under section 1930 of chapter 123 of Title 28 of the United States Code, but excluding Professional Claims.

5.     **"Administrative Expense Claim Objection Deadline"** means the deadline set forth in Article VI.A herein.

6.     **"Administrative Expense Request"** means a request for payment of an Administrative Expense Claim that is to be Filed in accordance with Article VI.A of this Combined Disclosure Statement and Plan.

7.     **"Allowed Claim"** means any Claim against the Debtor that is not a Disputed Claim or a Disallowed Claim; provided, however, that a Disputed Claim shall become an Allowed Claim to the extent (ii) an objection to such Claim has been interposed, but withdrawn or overruled by a Final Order, or (ii) the Bankruptcy Court enters a Final Order providing that such Claim is an Allowed Claim.

8.     **"Approved Budget"** means the budget attached as Exhibit 2 to the Final DIP Order, or any subsequent amended budget agreed to in writing by Debtor, the DIP Lenders, and the Committee.

9.     **"Assets"** means all of the assets of the Debtor of any nature whatsoever, including, without limitation, all property of the Estate, as defined by section 541 of the Bankruptcy Code, Cash, Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and the proceeds of all of the foregoing.

10.     **"Avoidance Actions"** means all avoidance and recovery actions or remedies that may be brought on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 550, 551, 552, or 553 of the Bankruptcy Code.

11.     **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

12.     **"Bankruptcy Court"** or **"Court"** means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Case, or if such Court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct thereof that

4

exercises jurisdiction over the Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of Delaware.

13.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and any Local Rules of the Bankruptcy Court, as amended from time to time.

14.    "**Bar Date**" or "**Bar Dates**" means any one or more of the General Bar Date, the Governmental Bar Date, and the Rejection Bar Date, as applicable.

15.    "**Bar Date Order**" means the *Order Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [D.I. 125].

16.    "**Bidding Procedures Motion**" means the *Motion of the Debtor for Entry of (I) an Order (A) Approving Bidding Procedures for the Sale of Substantially all of the Debtor's Assets, (B) Approving Procedures for the Assumption and Assignment of Executory Contracts or Unexpired Leases in Connection with the Sale, (C) Approving the Expense Reimbursement and (D) Granting Certain Related Relief* [D.I. 69].

17.    "**Business Day**" means any day other than a Saturday, Sunday or any other day on which commercial banks in Wilmington, Delaware are required or authorized to close by law or executive order.

18.    "**CARES Funding**" means relief funding provided by the Coronavirus Aid, Relief, and Economic Security (CARES) Act, passed on March 27, 2020.

19.    "**Cash**" means legal tender of the United States of America and equivalents thereof.

20.    "**Causes of Action**" means all Claims and all other claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims, whether arising under the Bankruptcy Code or other federal or state law, or based in equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, and any and all commercial tort claims against any party.

21.    "**Chapter 11 Case**" means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor, captioned *In re Superior Air Charter, LLC*, Case No. 20-11007 (CSS), currently pending in the Bankruptcy Court.

22.    "**Claim**" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

23.    "**Claims and Noticing Agent**" means Stretto.

24.    "**Claims Objection Deadline**" means one hundred eighty (180) days after the Effective Date or such later date as may be approved by the Bankruptcy Court; <u>provided</u>,

*however*, that for Administrative Expense Claims, such deadline shall be the Administrative Expense Claim Deadline.

25.    "**Class**" means any group of substantially similar Claims or Equity Interests classified by the Combined Disclosure Statement and Plan under sections 1122 and 1123(a)(1) of the Bankruptcy Code.

26.    "**Clerk**" means the clerk of the Bankruptcy Court.

27.    "**Combined Disclosure Statement and Plan**" means this combined disclosure statement and chapter 11 plan of liquidation including, without limitation, the Plan Supplement, all exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time in accordance with the terms hereof.

28.    "**Committee**" means the Official Committee of Unsecured Creditors appointed by the United States Trustee on May 12, 2020 [D.I. 49].

29.    "**Conditional Approval and Procedures Order**" has the meaning set forth in Article V.A.1 herein.

30.    "**Confirmation Notice**" has the meaning given in Article V.B.4.

31.    "**Confirmation Date**" means the date on which the Confirmation Order is entered on the Docket.

32.    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider (i) final approval of the Combined Disclosure Statement and Plan as providing adequate information as required by section 1125 of the Bankruptcy Code and (ii) confirmation of the Combined Disclosure Statement and Plan under section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

33.    "**Confirmation Order**" means the Order of the Bankruptcy Court confirming the Combined Disclosure Statement and Plan under section 1129 of the Bankruptcy Code.

34.    "**Creditor**" means any Person that is the Holder of a Claim against the Debtor.

35.    "**Credits**" has the meaning given in Article VIII.A.5.c.

36.    "**Debtor**" means, Superior Air Charter, LLC.

37.    "**Delux**" means Delux Public Charter, LLC, d/b/a JSX.

38.    "**DIP Credit Agreement**" means that $3,600,000 First Lien Secured Super-Priority Debtor-In-Possession Credit Agreement, dated as of April 28, 2020, by and between the Debtor and the DIP Lenders, as the same may have been further amended, modified, ratified, extended, renewed, restated or replaced.

39.     **"DIP Credit Facility"** means the debtor-in-possession financing provided to the Debtor during the Chapter 11 Case as provided under the DIP Credit Agreement.

40.     **"DIP Commitment"** means the $3,600,000.00 that was made available to the Debtor by the DIP Lenders under the DIP Credit Facility.

41.     **"DIP Documents"** means the DIP Credit Agreement, the other "Loan Documents" as described in the DIP Credit Agreement and any other agreements and documents related thereto.

42.     **"DIP Facility Claims"** means all Claims arising under or relating to the DIP Credit Facility, whether under the DIP Credit Agreement, any other DIP Document, any notes, the Final DIP Order, or otherwise.  For the avoidance of doubt, this amount shall be equal to the amount of the DIP Credit Facility actually drawn upon by the Debtor and advanced by the DIP Lenders.

43.     **"DIP Financing Order"** means the Court's *Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004 and 9014 (I) Authorizing Debtor to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [D.I. 115], entered on June 18, 2020.

44.     **"DIP Lenders"** means JetSuiteX and Delux.

45.     **"DIP Motion"** means the *Motion of the Debtor for Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Authorizing the Debtor to Obtain Postpetition Financing; (II) Granting Related Liens and Super-Priority Status, (III) Scheduling a Final Hearing Under Bankruptcy Rules 4001(B) and (C); and (IV) Granting Related Relief* [D.I. 7], Filed on April 28, 2020.

46.     **"Disallowed"** means any Claim against the Debtor or any portion thereof that (i) has been disallowed by a Final Order, (ii) is Scheduled as zero or as contingent, disputed or unliquidated and as to which no proof of claim or Administrative Expense Request has been timely Filed or deemed timely Filed with the Bankruptcy Court under either the Bankruptcy Code or any Final Order or otherwise deemed timely Filed under applicable law or the Combined Disclosure Statement and Plan, (iii) is not Scheduled and as to which no proof of claim or Administrative Expense Request has been timely Filed or deemed timely Filed with the Bankruptcy Court under either the Bankruptcy Code or any Order or otherwise deemed timely Filed under applicable law or the Combined Disclosure Statement and Plan, (iv) has been withdrawn by agreement of the Debtor and the Holder thereof or (v) has been withdrawn by the Holder thereof.

47.     **"Disputed"** means any Claim against the Debtor or any portion thereof that (i) has not been Scheduled by the Debtor or has been Scheduled as unknown, contingent, unliquidated, disputed or at zero, if such Claim is not the subject of a proof of claim, or (ii) is the subject of an objection interposed by the Claims Objection Deadline or such other time period fixed by the Bankruptcy Court, which has not been withdrawn or overruled by a Final Order;

provided, however, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or Disallowed Claim.

48.    **"Distribution"** means any distribution to the Holders of Allowed Claims.

49.    **"Distribution Date"** means any date on which a Distribution is made to Holders of Allowed Claims under this Combined Disclosure Statement and Plan, or as otherwise agreed. The first Distributions shall occur on or as soon as practicable after the Effective Date or as otherwise agreed by the Reorganized Debtor, the DIP Lenders, and the GUC Trustee, as applicable. To the extent subsequent Distributions are necessary, such subsequent Distributions shall occur as soon after the first Distribution Date as the GUC Trustee shall determine in accordance with the GUC Trust Agreement.

50.    **"Docket"** means the docket in the Chapter 11 Case maintained by the Clerk.

51.    **"Effective Date"** means the date established by Article XIV of this Combined Disclosure Statement and Plan.

52.    **"Entity"** means an entity as defined in section 101(15) of the Bankruptcy Code.

53.    **"Equity Interests"** means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in the Debtor (or Reorganized Debtor, as applicable), whether or not transferable, any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest, and any and all Claims that are otherwise determined by the Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest.

54.    **"Estate"** means the estate of the Debtor created upon the commencement of the Chapter 11 Case under section 541 of the Bankruptcy Code.

55.    **"Exculpated Parties"** means the following Entities, each in their respective capacities as such, (a) the Debtor; (b) the Reorganized Debtor; (c) the Committee and its members; (d) the Professionals; and (e) all directors, managers and officers of the Debtor or Reorganized Debtor.

56.    **"Executory Contract"** means a contract or unexpired lease, as it may have been amended, restated or otherwise modified and including any codicils, amendments, exhibits or annexes thereto, if any, between the Debtor and any other Person or Entity as of the Filing Date that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

57.    **"Existing Equity Interests"** means all issued and outstanding Equity Interests in the Debtor, including any vested or unvested and exercised or unexercised options or warrants to acquire such Equity Interests.

58.    **"File,"** "**Filed**" or "**Filing**" means filed, filed or filing with the Bankruptcy Court in the Chapter 11 Cases.

59.    **"Filing Date"** means April 28, 2020.

60.    **"Final Order"** means an Order of the Bankruptcy Court or a Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending.

61.    **"Financed Aircraft"** has the meaning given in Article III.A.1.

62.    **"First Day Declaration"** means the *Declaration of Edward T. Gavin, CTP, Chief Restructuring Officer of the Debtor, in Support of Debtor's Chapter 11 Petition and First Day Motions* [D.I. 8].

*63.*    **"General Bar Date"** means July 27, 2020 at 4:00 p.m. (prevailing Eastern Time), as stated in the *Notice of Entry of Order Establishing Bar Dates for Filing Proofs of Claim Including Section 503(B)(9) Claims*, Filed on June 25, 2020 [D.I. 131].

64.    **"General Unsecured Claim"** means any Claim against the Debtor that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Filing Date and that is not a SuiteKey Claim, an Administrative Expense Claim, Priority Tax Claim, Other  Priority Claim, or Other Secured Claim, but which includes any claim arising from the rejection of an Executory Contract.  For the avoidance of doubt, General Unsecured Claims includes any SuiteKey Claims for which the Holder(s) elect for such Claims to be treated as a General Unsecured Claim, rather than a SuiteKey Claim.

65.    **"Governmental Unit"** shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

66.    **"Governmental Bar Date"** means October 26, 2020, which is the deadline for Governmental Units to File proofs of claim on account of pre-petition Claims against the Debtor.

67.    **"GUC Plan Consideration"** means the DIP Commitment, less the amount of any Allowed DIP Facility Claims.

68.    **"GUC Trust"** means the trust established for the benefit of the GUC Trust Beneficiaries on the Effective Date in accordance with the terms of this Combined Disclosure Statement and Plan and the GUC Trust Agreement.

69.    **"GUC Trust Agreement"** means the agreement between the Debtor and the GUC Trustee, in a form as consented to by the Committee and the DIP Lenders (which consent shall not be unreasonably withheld, conditioned or delayed), as the same may be amended from time to time in accordance with its terms, Filed as part of the Plan Supplement and approved by the Confirmation Order.

70.    **"GUC Trust Beneficiaries"** means the holders of Allowed General Unsecured Claims that are entitled to receive a Distribution under the Plan.

71.    **"GUC Trust Payment"** means, as more fully described in the GUC Trust Agreement, the Cash transferred to the GUC Trust on the Effective Date by (i) the DIP Lenders to fund the GUC Plan Consideration and (ii) Delux to fund the MSA Reconciliation Payment.

72.    **"GUC Trustee Activities"** means those activities performed by the GUC Trustee, or its designees, related to General Unsecured Claims and SuiteKey Claims, including, but not limited to, (i) reconciling and objecting to General Unsecured Claims and SuiteKey Claims, (ii) making Distributions to GUC Trust Beneficiaries in accordance with the terms of this Combined Disclosure Statement and Plan and the GUC Trust Agreement, and (iii) pursuing activities meant to maximize the GUC Plan Consideration, as more fully set forth in the GUC Trust Agreement.

73.    **"GUC Trustee"** means the person appointed under Article IX.A of the Combined Disclosure Statement and Plan.

74.    **"GUC Trust Proceeds"** means the following proceeds funded to the GUC Trust under the terms of the GUC Trust Agreement: (a) the GUC Plan Consideration and (b) the MSA Reconciliation Payment.

75.    **"GUC Trust Reserve"** means the GUC Trust Payment.

76.    **"Holder"** means the beneficial holder of any Claim or Equity Interest.

77.    **"Initial Discount Period"** has the meaning given in Article VIII.A.5.c.

78.    **"Interim Compensation Order"** means the Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals [D.I. 157].

79.    **"IRC"** has the meaning given in Article III.C.

80.    **"IRS"** has the meaning given in Article III.C.

81.    **"JetSuiteX"** means JetSuiteX, Inc.

82.    **"JSI"** means JSI, LLC.

83.    "**JetSuiteX Unsecured Demand Notes**" has the meaning given in Article III.A.4.a.

84.    **"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

85.    **"Leased Aircraft"** has the meaning given in Article III.A.1.

86.    "**MSA**" means the Management Services Agreement between Delux and the Debtor dated June 1, 2016, as amended January 1, 2019 and subsequently amended on April 28, 2020.

87.   "**MSA Reconciliation Payment**" means Cash in the amount of $224,000.00 to be paid by Delux to the GUC Trust on the Effective Date to reconcile certain payments by the Debtor to Delux under the MSA.

88.   "**Non-Debtor Affiliates**" means Delux, JSI, and JetSuiteX, collectively.

89.   "**Order**" means an order or judgment of the Bankruptcy Court as entered on the Docket.

90.   "**Other Priority Claim**" means a Claim that is accorded priority in right of payment under section 507 of the Bankruptcy Code, other than a Priority Tax Claim, Administrative Expense Claim, or Professional Claim.

91.    "**Other Secured Claims**" means and any and all Claims against the Debtor to the extent reflected in the Schedules or a proof of claim Filed as a secured Claim, which is (i) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, (ii) in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

92.   "**Part 135 Certificate**" means the Debtor's certificate permitting it to operate a charter under 14 C.F.R. Part 135.

93.   "**Person**" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

94.   "**Plan Supplement**" means (i) the form of the GUC Trust Agreement, (ii) the identification of the GUC Trustee and, if the GUC Trustee is deemed an "insider", as defined by section 101(31) of the Bankruptcy Code, the material terms of its compensation, and (iii) any other documents, agreements, schedules, and exhibits, specified herein, to be Filed with the Bankruptcy Court no later than seven (7) days prior to the Voting Deadline, unless otherwise provided herein; provided, however, that the Debtor may amend such Plan Supplement, with the consent of the DIP Lenders and the Committee, at any time prior to the Effective Date.

95.   "**Priority Tax Claim**" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

96.   "**Professional**" means any professional person employed in the Chapter 11 Case under section 327, 328 or 1103 of the Bankruptcy Code by an Order of the Bankruptcy Court and to be compensated for services rendered under sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.  Such term shall also include Gavin/Solmonese, LLC, the Chief Restructuring Officer of the Debtor as approved by the Court at D.I. 73.  The term "Professional" does not include any ordinary course professionals that were retained and compensated by the *Order Authorizing Employment and Compensation of Professionals Utilized in Ordinary Course of Business, Effective* Nunc Pro Tunc *to the Petition Date* [D.I. 100], entered on June 5, 2020.

97.    **"Professional Claims"** means all Claims under sections 330, 331, 503, or 1103 of the Bankruptcy Code for compensation and reimbursement of expenses by Professionals to the extent Allowed by the Bankruptcy Court.

98.    **"Professional Claims Objection Deadline"** has the meaning set forth in Article VI.D.4 herein.

99.    **"Professional Fee Reserve"** means a reserve or escrow established for the benefit of the Holders of Allowed Professional Claims which amount shall be the amount necessary to satisfy in full Allowed Professional Claims.  For the avoidance of doubt, any fees and expenses by Professionals in connection with preparing fee applications shall be paid from the Professional Fee Reserve.

100.    **"Pro Rata"** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class or to the aggregate amount of relevant Claims, as indicated by the context.

101.    **"Purchased Aircraft"** has the meaning given in Article III.A.1.

102.    **"Rejection Bar Date"** means the deadline to File a proof of claim for damages relating to the rejection of an Executory Contract which, under the Bar Date Order, is the later of (a) the General Bar Date, (b) unless otherwise agreed to by the Debtor or GUC Trustee, as applicable, thirty (30) days after service of any Order authorizing the rejection of such contract or lease, or (c) thirty (30) days after the Effective Date for Executory Contracts rejected by effect of this Combined Disclosure Statement and Plan.

103.    **"Related Parties"** means, with respect to any Person or Entity, such Person's or Entity's current and former direct or indirect subsidiaries and affiliates and each of their respective current and former stockholders, members, limited partners, general partners, equity holders, directors, managers, officers, employees, agents, designees, attorneys, financial advisors, investment bankers, accountants, and other professionals or representatives.

104.    **"Released Parties"** means the following Entities, each in their capacity as such, (a) the Debtor and Reorganized Debtor; (b) the DIP Lenders; (c) the Committee and its members; and (d) the Related Parties of the foregoing.

105.    **"Releasing Parties"** means the following Entities, each in their respective capacities as such, (a) the Debtor; (b) the DIP Lenders; (c) the Committee and its members; (d) each Holder of a Claim; (e) each Holder of an Equity Interest; and (f) the Related Parties of the foregoing.  For the avoidance of doubt, the United States Trustee is not a Releasing Party.

106.    **"Remaining Discount Period"** has the meaning given in Article VIII.A.5.c.

107.    **"Reorganized Debtor"** means the Debtor, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

108.    **"Schedules"** means the schedules of assets and liabilities and the statement of financial affairs Filed by the Debtor on June 3, 2020 and any and all amendments and modifications thereto.

109.    **"Solicitation Notice"** has the meaning given in Article V.B.4.

110.    **"SuiteKey Agreements"** means those certain agreements titled SuiteKey Agreement" or "50K/100K/200K/400K SuiteKey Agreement," as executed between a SuiteKey Claimant and the Debtor from time to time, or such similar agreements with SuiteKey Claimants.

111.    **"SuiteKey Claimant"** means a holder of an Allowed SuiteKey Claim.

112.    **"SuiteKey Claim"** means a claim equal to the amount of the "notional balance" (as such term is used in Section 2.a. of the SuiteKey Agreements) or remaining funds or credits held or maintained by the Debtor to pay for flight expenses and charges on behalf of a given SuiteKey Claimant, as of the Filing Date.

113.    **"Subordinated Claim"** means (i) any Claim on account of the JetSuiteX Unsecured Demand Notes; (ii) all Claims against the Debtor of the type described in section 510(b) of the Bankruptcy Code; (iii) any Claim that is equitably subordinated to all general unsecured Claims by operation of section 510(c) of the Bankruptcy Code; and (iv) any Claim against the Debtor, whether secured or unsecured, for any fine, penalty, forfeiture, attorneys' fees (to the extent that such attorneys' fees are punitive in nature), multiple, exemplary or punitive damages, or for any other amount that does not represent compensation for actual pecuniary loss suffered by the Holder of such Claim to the extent provided by applicable law.

114.    **"Tax Code"** means the Internal Revenue Code of 1986, as amended.

115.    **"United States Trustee"** means the Office of the United States Trustee for the District of Delaware.

116.    **"Unclaimed Distribution"** means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

117.    **"Unclaimed Distribution Deadline"** means ninety (90) days from the date the GUC Trustee makes a Distribution of Cash or other property under the Combined Disclosure Statement and Plan to a Holder of an Allowed Claim.

118.    **"Voting Deadline"** has the meaning given in Article V.B.5.

**B.        Interpretation; Application of Definitions and Rules of Construction**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule or exhibit references in the Combined Disclosure Statement and Plan are to the respective section in, Article of, Schedule to, or Exhibit to the Combined Disclosure Statement and Plan. The words "herein," "hereof," "hereto," "hereunder"

and other words of similar import refer to the Combined Disclosure Statement and Plan as a whole and not to any particular section, subsection or clause contained in the Combined Disclosure Statement and Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Disclosure Statement and Plan. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in the Combined Disclosure Statement and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Disclosure Statement and Plan.

## III.    BACKGROUND AND DISCLOSURES

On the Filing Date, the Debtor Filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and, since that date, has operated as a debtor in possession as authorized by sections 1107 and 1108 of the Bankruptcy Code.

### A.    General Background[4]

#### 1.    Debtor Overview and Business Operations

The Debtor is a Delaware LLC formed on November 18, 2009, with its current headquarters in Dallas, TX.  The Debtor is a Federal Aviation Administration certified Part 135 air charter carrier.  Until the recent COVID-19 disruption, the Debtor employed more than 100 employees, and operated with a combined fleet of twelve (12) aircraft, comprised of the following: (i) two Embraer Phenom 100 aircraft (the "**Purchased Aircraft**"); (ii) another Embraer Phenom 100 aircraft financed through UT Finance Corporation, with approximately $258,000 remaining on its ten-year financing term (ending November 2020) (the "**Financed Aircraft**"); and (iii) nine airplanes leased through various lessors, including one Embraer Phenom 100 aircraft and eight Embraer Phenom 300 aircraft (collectively, the "**Leased Aircraft**").  At the time of the Filing Date, the Leased Aircraft had between nineteen and fifty-six months remaining on their respective leases.  Immediately prior to the Filing Date, two of the lessors of the Leased Aircraft delivered Notices of Default to the Debtor and retook possession of the Lease Aircraft under the terms of the applicable leases.  Since the Filing Date, all lease agreements between the lessors and the Debtor governing the Leased Aircraft have since been rejected.

Like many air charter companies, the Debtor's revenue derived primarily from customers who purchased "jet cards" from the Debtor, referred to as "SuiteKey Agreements".  SuiteKey Agreements were purchased by way of non-refundable pre-purchase payments, in amounts ranging from $50,000 to $500,000.  Entering into a SuiteKey Agreement allowed customers to have access to the Debtor's private charter services, allowing for flights within the Debtor's primary service area—California, Nevada, Arizona, Utah, New Mexico, and Colorado—on as

---

[4] Further information regarding the Debtor's business, assets, capital structure, and the circumstances leading to the filing of this Chapter 11 Case is set forth in detail in the First Day Declaration, which is incorporated by reference herein.  Copies of the First Day Declaration and all other filings in this Chapter 11 Case can be obtained (and viewed) free of charge at the following web address: https://cases.stretto.com/superiorair.

little as forty-eight hours' notice.  All funds from the SuiteKey Agreement payments were retained and used in the Debtor's general operations by the terms of the SuiteKey Agreements; the customers, meanwhile, maintained non-cash notional balances equal to the amount of their SuiteKey Agreement payment, which were then reduced on a tiered hourly basis (with the reduction equal to the hourly rate for the flight chartered multiplied by the number of hours used per flight).  The majority of customers had up to twenty-four (24) months to utilize the notional balance of their accounts; the balance of customers (approximately 40%) are on non-expiring Agreements.

### 2.    Organizational Structure

The Debtor is a wholly owned subsidiary of the non-debtor JSI.  In turn, JSI is wholly owned by the non-Debtor JetSuiteX.  JetSuiteX likewise wholly owns non-debtor Delux.

### 3.    Secured Debt

As of the Filing Date, the Debtor had no outstanding senior secured debt.  The Debtor's only pre-petition secured creditor is UT Finance Corporation with respect to the Financed Aircraft.  As of the Filing Date, the Debtor owed approximately $258,000 with regard to the remaining portion of the ten-year term of the Financed Aircraft (ending November 2020), which amount has continued to be paid down in the ordinary course of this Chapter 11 Case.

### 4.    Unsecured Debt

#### (a) JetSuiteX Unsecured Demand Notes

The Debtor is a party to a series of promissory notes with JetSuiteX, issued between September 2019 and March 2020, in the principal sum of $16.2 million (the "**JetSuiteX Unsecured Demand Notes**").  The JetSuiteX Unsecured Demand Notes are unsecured, payable upon demand and bear no interest.  The Debtor is not required to make any payments under the JetSuiteX Unsecured Demand Notes unless and until demand is made thereunder or an event of default occurs which remains uncured. The JetSuiteX Unsecured Demand Notes reflect a series of advances that were made prepetition by JetSuiteX to the Debtor to support the Debtor's operations.

#### (b) Remaining Unsecured Debt

Aside from the JetSuiteX Unsecured Demand Notes, as of the Filing Date, the Debtor's remaining unsecured debt stems from a variety of sources, including (i) accrued and unpaid trade debt incurred in the ordinary course of the Debtor's business; (ii) claims by lease and contract counterparties for unpaid obligations and subsequent rejection damage claims incurred during this Chapter 11 Case; (iii) litigation claims relating to disputed maintenance fees as to former planes owned by the Debtor, with liability alleged against the Debtor of at least $250,000, possibly as much as $2.4 million; and (iv) customer claims on the basis of the SuiteKey Agreements, with a combined notional balance of approximately $50 million.  In the aggregate (i.e. including the JetSuiteX Unsecured Demand Notes balance), the Debtor estimates that its unsecured debt, as of the Filing Date, totaled nearly $75 million.  Claims on account of additional rejected Executory Contracts during the Chapter 11 Case could cause the amount of

unsecured claims to increase, and payments made under certain motions described below may reduce that amount.

### 5.    Equity Interests

As discussed above, the Debtor is wholly owned by JSI.

### 6.    Relationships with Non-Debtor Affiliates

In the ordinary course of business and for the sake of efficiency, the Debtor engages in certain transactions with non-Debtor affiliate Delux.  This relationship is detailed in part by the MSA.  Specifically, the Debtor relies on employees shared with Delux via the MSA, as well as on numerous support services that are provided by Delux; the employees and services span a variety of categories.   The MSA provides for those services and reimbursement of costs, which the Debtor and Delux coordinate and allocate without any markup or premium among the Debtor's business and Delux's business.  The allocation amount was historically derived from the revenue of the respective entities; i.e., the portion for which the Debtor was obligated to Delux was a percentage based on the Debtor's revenue as compared to Delux's revenue.  The reimbursement obligations are bilateral depending on the category and expenses for a given month.

This longstanding historical practice of sharing employees and support services for the Debtor's business allowed the Debtor (as well as Delux) to realize otherwise unavailable synergies and efficiencies, and to ultimately pay costs below the amount that would be necessary were each business to maintain its own separate employee base and support services. For example, the Debtor and Delux benefit from lower overhead costs as a result of shared back-office and management services.  Both the Debtor and Delux have historically saved millions of dollars annually as a result of the dynamic set forth in the MSA; as a practical matter, it would be economically unsound if not impossible for the Debtor to have operated in the absence of such an agreement.

Prior to the Filing Date, the portion for which the Debtor was responsible under the MSA had fallen to $0.00 because its operations became shuttered and were generating no revenue.  As a result, the Debtor and Delux revised the MSA prior to the Filing Date in order to account for the Debtor's current financial status.  The amendment provided for a fixed allocation whereby the Debtor would pay 25% of the costs of the services and Delux would pay 75%.  This allocation resulted in only a few hundred thousand dollars paid by the Debtor, but allowed the Debtor to continue to receive necessary services for a smooth transition into this Chapter 11 Case.

There were also non-MSA-related transactions between the Debtor and the Non-Debtor Affiliates.  The net result of these transactions was in excess of $50 million *in favor of* the Debtor, not the opposite.  The Debtor was funded for years at a loss by the Non-Debtor Affiliates in the hopes that it might finally turn a profit, and these payments (as with the SuiteKey payments) were used solely to fund the Debtor's operations.  This is reflected in the following chart showing the cash flow into and out of the Debtor and the Non-Debtor affiliates:

| | | | Superior Air Charter, LLC Cash Transfers to/from -Cash in /(Cash out) | | | |
|---|---|---|---|---|---|---|
| Year | Delux Public Charter, LLC | JSI LLC | JetSuiteX, Inc. | JS CJ3 LLC | Totals - Cash In | Totals - Cash Out |
| 2016 | $ (47,295) | $ 3,477,000 | $ (270,029) | $ (391,360) | $ 3,477,000 | $ (708,683) |

16

| | | | | | |
|---|---|---|---|---|---|
| **2017** | | $ 2,514,005 | $ 3,653,032 | $ (1,357,750) | $ 6,167,037 | $ (1,357,750) |
| **2018** | $ 2,736,278 | $ 9,079,587 | $ 2,470,798 | $ (391,360) | $ 14,286,663 | $ (391,360) |
| **2019** | $ 817,450 | $ 3,971,265 | $ 15,009,470 | | $ 19,798,185 | $ - |
| **2020** | $ 410,278 | $ 39,804 | $ 13,516,909 | | $ 13,966,991 | $ - |
| **Grand Total** | $ 3,916,710 | $ 19,081,661 | $ 34,380,181 | $ (2,140,469) | $ 57,695,876 | $ (2,457,793) |

The Debtor furloughed substantially all of its employees across its departments who were dedicated employees of the Debtor. As a result, as of the Filing Date the Debtor maintained only four employees who are solely dedicated to the Debtor, as required to maintain the good standing of the Debtor's Part 135 Certificate; the Debtor also still shares services for four additional employees under the MSA (namely two executives, IT, and human resources).

### 7. Events Leading to the Chapter 11 Case and Goals During The Chapter 11 Case

The Debtor's ultimate bankruptcy filing was precipitated by a number of factors. Despite the substantial amount of capital invested in the Debtor by its Non-Debtor Affiliates over the years – the Debtor was the net recipient of more than $50 million from said affiliates in order to sustain its operations[5] – and despite the overall popularity and safety of the Debtor's brand, the industry itself is one with extraordinarily thin margins. In light of that, the Debtor was never able to generate sufficient revenue to do more than cover its operating expenses, with nothing left to cover its monthly fixed expenses. Although the Debtor remained confident that profitability was never far from reach, it never realized that critical threshold.

Compounding these issues was the Debtor's unsuccessful attempt to expand its operations into the highly competitive East Coast market. This effort was beset by problems from the start, as the supposedly reputable planes the Debtor acquired for servicing this market were riddled with technical defects that rendered them virtually unusable at worst, unreliable at best. This costly venture ended with the Debtor's return of all the defective planes to their lessors, forced abandonment of the East Coast market, and led to an overall retrenchment back to a service area based around the West Coast. Relatively contemporaneous with this retrenchment was the loss of valuable salespeople for the Debtor's operations, which only further strained its revenue.

Thus, the arrival of the COVID-19 pandemic in March 2020 and its impact on both the Debtor's operations and the economy at large proved to be a burden the Debtor could not bear. The aviation industry (if not the travel industry generally) has experienced a rapid decline in bookings and an increase in cancellations. Every state within the Debtor's primary service area

---

[5] Indeed, aside from the operational synergies realized under the MSA as discussed above, the Non-Debtor Affiliates experienced **no** economic benefit from its affiliation with the Debtor; to the contrary, they spent many years investing in the Debtor, which investments (along with the Debtor's revenue) went towards supporting the Debtor's operations, but which were ultimately unsuccessful. The list of payments made by the Debtor in the months leading up to this bankruptcy reflect the same, as seen in Sections 3 and 4 of the Debtor's *Statement of Financial Affairs*, Filed June 4, 2020 at D.I. 92.

was placed under a "stay at home" order, or a variant of the same. Other airlines both within the charter business and without have likewise succumbed to COVID's impact[6]; the current state of the charter industry has been characterized as a "race to the bottom."[7] Even non-aviation related travel services have fallen victim to the havoc wrought by COVID, including The Hertz Corporation (the second-largest car rental service in the country) and Advantage Rent a Car.[8] For a business model as capital-intensive and thinly margined as the Debtor's business tends to be, this quickly rendered its operations no longer viable.

As a result of the accelerated pace of the COVID-19 pandemic, the Debtor realized it would not have sufficient cash to fund operations, including its payroll obligations due and payable on and after April 30, 2020. Thus, the Debtor made efforts over the month prior to the Filing Date to alleviate its liquidity burden, including seeking financing based upon its existing aircraft or otherwise working with its existing lessors. This endeavor was at least partially offset, however, by the fact that the Debtor ceased its services and acquiring new customers on or about April 10, once it became clearer that the pandemic's impact was not going to be a transitory interruption. Ultimately, it was clear that there was little option for any additional funding given the dramatic COVID-19-related reduction in passenger demand and general uncertainty about when demand will normalize in the future.[9] The Debtor also explored the relief sponsored by the U.S. government under the Coronavirus Aid, Relief, and Economic Security Act, but as of the date of this Combined Disclosure Statement and Plan, those efforts have not borne any fruit.

Unfortunately, the Debtor was unable to avoid the same fate realized by Ravn Air Group, Miami Air International, Hertz Corporation, Advantage Rent a Car, and others. Based on the above circumstances, the Debtor made the difficult determination that the Filing of this Chapter 11 Case was in the best interests of the Debtor and its stakeholders.

**B.      The Chapter 11 Case**

The following is a brief description of certain material events that have occurred during this Chapter 11 Case.

---

[6] *See In re Miami Air Int'l, Inc.*, Case No. 20-13924 (AJC) (Bankr. S.D. Fla. 2020) (filed March 24, 2020); *In re Ravn Air Group, Inc.*, Case No. 20-10755 (BLS) (Bankr. D. Del. 2020) (filed April 5, 2020); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) (Bankr. S.D.N.Y. 2020) (filed May 10, 2020); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. 2020) (filed May 26, 2020); *In re Virgin Australia Holdings Ltd.*, Case No. 20-11024 (SHL) (Bankr. S.D.N.Y. 2020) (filed for Chapter 15 recognition on April 29, 2020). *See also* Tim Hepher, *Airbus Slashes Jet Output to Tackle Coronavirus Crisis*, Reuters (Apr. 8, 2020), https://www.reuters.com/article/us-airbus-production/airbus-slashes-jet-output-to-tackle-coronavirus-crisis-idUSKCN21Q2LR.
[7] *See* Kerry Lynch, *Charter Operators Facing Race to the Bottom on Pricing*, AIN Online (May 20, 2020), https://www.ainonline.com/aviation-news/business-aviation/2020-05-20/charter-operators-facing-race-bottom-pricing.
[8] *See The Hertz Corporation*, Case No. 20-11218 (MFW) (Bankr. D. Del. 2020) (filed May 24, 2020); *In re Advantage Holdco, Inc.*, Case No. 20-11259 (JTD) (Bankr. D. Del. 2020) (filed May 26, 2020).
[9] Indeed, as noted above, the global economic situation has only worsened since the Filing Date.

1. **First Day Motions and Orders (other than the DIP Motion and DIP Financing Order).**

On the Filing Date, in addition to the voluntary petition for relief Filed by the Debtor, the Debtor also Filed a number of routine motions and applications seeking certain "first day" relief, including the following:

    a.    *Debtor's Application for Appointment of Stretto as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 2]

    b.    *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System, (II) Authorizing Continued Use of Existing Business Forms, (III) Authorizing the Continuation of Intercompany Transactions, (IV) Granting Administrative Priority Status to Post-Petition Intercompany Transactions, (V) Authorizing Use of Prepetition Bank Accounts, and (VI) Temporarily Suspending the Requirements of 11 U.S.C. Section 345(B)* [D.I. 3].

    c.    *Motion of the Debtor for Entry of Interim and Final Orders (A) Authorizing the Debtor to Pay Prepetition Sales, Use, and Similar Taxes in the Ordinary Course of Business, and (B) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto* [D.I. 4].

    d.    *Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Prepetition Insurance Policies, and (B) Pay All Prepetition Obligations in Respect Thereof, and (II) Authorizing Banks to Honor Related Checks and Transfers* [D.I. 5].

    e.    *Motion of the Debtor for Entry of Interim and Final Orders Authorizing Payment of Certain Prepetition Employee-Related Claims and Granting Related Relief* [D.I. 6].

2. **Post-Petition Financing**

On the Filing Date, the Debtor also Filed the DIP Motion, asking the Bankruptcy Court to, among other things, authorize the Debtor to obtain the DIP Credit Facility from the DIP Lenders, grant the DIP Lenders senior, super priority liens on certain prepetition collateral (described in the motion) securing the DIP Credit Facility, and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents. The Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis on April 29, 2020 [D.I. 25], a further interim basis on May 21, 2020 [D.I. 79], and thereafter entered the DIP Financing Order granting the relief requested in the motion on a final basis on June 18, 2020 [D.I 115].

### 3.    Employment and Compensation of Debtor's Professionals and Advisors

On May 1, 2020, the Debtor Filed applications to retain Bayard, P.A. as its bankruptcy counsel; Gavin/Solmonese LLC to provide its Chief Restructuring Officer, Edward T. Gavin, CTP and other professionals, and Stretto as its Administrative Advisor.  [D.I. 37-39], which retentions were approved by orders entered by the Bankruptcy Court on May 21, 2020 [D.I. 71-73].  Additionally, on June 5, 2020, the Bankruptcy Court entered an order approving the Debtor's retention of certain professionals utilized in the ordinary course of its business [D.I. 100].

### 4.    Appointment of Committee

On May 12, 2020, The United States Trustee appointed the Committee [D.I. 49].  The members of the Committee are as follows: (i) Netflix, Inc., (ii) Jet Support Services Inc., (iii) Joseph Nettemeyer, and (iv) John Danahy.[10]  The Bankruptcy Court entered an Order authorizing the Committee to retain Pepper Hamilton LLP as its counsel on June 17, 2020 [D.I. 112 ].

### 5.    Claims Process and Bar Date

#### a.    *Section 341(a) Meeting of Creditors*

On June 8, 2020, the United States Trustee presided over the section 341(a) meeting of the creditors in the Chapter 11 Case.

#### b.    *Schedules and Statements*

The Debtor Filed with the Bankruptcy Court its Schedules on June 4, 2020.

#### c.    *Bar Date*

On June 12, 2020, the Debtor Filed a *Motion for an Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Notice Thereof* [D.I. 109], seeking entry of an Order establishing certain proof of claim deadlines.

### 6.    Post-petition Sale Efforts

On May 15, 2020, the Debtor Filed the *Application of the Debtor for Entry of an Order Pursuant to Sections 327(a) And 328(a) of the Bankruptcy Code Authorizing the Retention and Employment Of SSG Advisors, LLC as Investment Banker to the Debtor* Nunc Pro Tunc *to May 13, 2020 and Waiving Certain of the Requirements of Local Rule 2016-2* [D.I. 54], by which the Debtor sought to retain SSG Capital Advisors, LLC in connection with the marketing and sale of its assets.  Additionally, on May 20, 2020, the Debtor Filed a *Motion of the Debtor for Entry of (I) an Order (A) Approving Bidding Procedures for the Sale of Substantially all of the Debtor's Assets, (B) Approving Procedures for the Assumption and Assignment of Executory Contracts or*

---

[10]    John Traub was initially appointed as a member of the Committee, but he resigned effective May 25, 2020 (*see* D.I. 83).

*Unexpired Leases in Connection with the Sale, (C) Approving the Expense Reimbursement and (D) Granting Certain Related Relief* [D.I. 69], by which the Debtor sought approval of certain procedures related to the potential auction and sale of its assets.  As a result of the settlement agreed to by the Debtor, the committee and the DIP Lenders that resulted in this Combined Disclosure Statement and Plan, on June 24, 2020, the Debtor withdrew the motion to establish sale procedures [D.I. 127].

### 7.    Other Significant Motions in the Bankruptcy Case

In addition to the motions and applications described above, the Debtor Filed the following significant motions: (i) the *First Omnibus Motion of the Debtor for an Order Authorizing Rejection of Certain Unexpired Leases and Executory Contracts Effective Nunc Pro Tunc to the Petition Date* [D.I. 36], by which the Bankruptcy Court approved the rejection of certain aircraft leases; (ii) the *Motion of the Debtor for Entry of an Order Authorizing, But Not Directing, Payment of Prepetition Claims of Clay Lacy Pursuant to 11 U.S.C. §§ 105(a) and 363(b)* [D.I. 65], by which the Bankruptcy Court authorized the Debtor to pay the prepetition claims of a critical vendor; (iii) the *Second Omnibus Motion of the Debtor for an Order Authorizing Rejection of Certain Unexpired Leases and Executory Contracts Effective Nunc Pro Tunc to the Petition Date* [D.I. 118], by which the Bankruptcy Court approved the rejection of one additional aircraft lease and several service contracts rendered moot.

### 8.    Chapter 11 Plan Terms

As a result of successful negotiations between the Debtor, the Committee and the DIP Lenders, the Debtor hereby proposes this Combined Disclosure Statement and Plan under sections 1125 and 1129 of the Bankruptcy Code.  The Debtor and the Committee are the proponents of the Combined Disclosure Statement and Plan within the meaning of Bankruptcy Code section 1129.

The Combined Disclosure Statement and Plan is a chapter 11 plan of reorganization. The Combined Disclosure Statement and Plan accomplishes a number of beneficial outcomes for the Debtor and its creditors, including among others:

- *The Debtor's Emergence from Chapter 11:* except as otherwise provided in this Combined Disclosure Statement and Plan, the Reorganized Debtor shall continue to exist on and after the Effective Date as a limited liability company, with all of the powers of such an entity under the laws of the State of Delaware and as provided under such Debtor's operating agreement in effect immediately prior to the Effective Date (provided that such organizational documents shall be amended to prohibit the Reorganized Debtor from issuing non-voting equity securities, to the extent necessary to comply with section 1123(a) of the Bankruptcy Code), without prejudice to any right of the Reorganized Debtor to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. In accordance with Article XI.D.2, and except as explicitly provided in this Combined Disclosure Statement and Plan, on the Effective Date, all property comprising the Estate shall vest in the Reorganized Debtor free and clear of all Liens, Claims, charges, and other encumbrances.

Specifically, upon the Effective Date, the following assets, among others, shall revest in the Reorganized Debtor: (i) the Purchased and Financed Aircraft; (ii) the Part 135 Certificate; (iii) the Debtor's customer list; (iv) the Debtor's intellectual property and trademarks; and (v) all Causes of Action including Avoidance Actions (which Avoidance Actions shall be deemed waived by the Reorganized Debtor on the Effective Date). Further, the Reorganized Debtor shall not assume any Claims or liabilities of the Debtor, except as specifically provided herein, which Claims or liabilities shall be discharged as against the Reorganized Debtor.

Finally, the Debtor will reinstate Equity Interests held by JSI (as assignee of the DIP Lenders) as doing so advances an efficient reorganization by avoiding the need to unwind and recreate the corporate structure and relationships of the Debtor and the Non-Debtor Affiliates. Moreover, reinstatement does not affect the economic substance of the Combined Disclosure Statement and Plan for the Debtor's stakeholders. Indeed, Class 4 and 5 are receiving value that would otherwise be distributable to the DIP Lenders. The Equity Interests in the Debtor have no realizable economic value independent of the maintenance of the corporate structure between the Debtor and the Non-Debtor Affiliates, including the DIP Lenders.

The Debtor estimates the value of the acquired Assets to be as follows: (i) the Purchased and Financed aircraft is valued at approximately $1,650,000, less the remaining $258,000 due as to the Financed Aircraft; (ii) the Operating Certificate value is valued at approximately $220,329.18, as reflected in the Debtor's Schedules;[11] (iii) the Debtor's customer list has an unknown value at this time, but as reflected in the Debtor's schedules, it may have value in the market;[12] (iv) the Debtor's intellectual property and trademarks are valued at $0.00 or such other nominal value; (v) the value of the Causes of Action are valued at $0.00 or such other nominal value, and the Avoidance Actions are being waived by the Reorganized Debtor in any event.

- *The Establishment of the GUC Trust:* the GUC Trust shall be established for purposes of making distributions to Holders of Allowed General Unsecured Claims. The GUC Trust will make distributions to Holders of General Unsecured Claims of not less than the GUC Plan Consideration.

---

[11] The Certificate's value to an outside purchaser could be more than this (the Debtor estimates that in no event would it be more than $1.0 million) or significantly less depending on the party. This estimate makes no assumption about said market participant's ability to otherwise satisfy any governmental regulations attendant with acquisition or the potentially lengthy time for doing so.

[12] It should be noted that the Debtor's customer list was misappropriated by a former salesperson for the Debtor prior to the Filing Date. While the Debtor immediately issued a cease and desist letter to the former employee and his new employer, said misappropriation may ultimately diminish the value of the customer list.

- *Credits for SuiteKey Claimants*: as outlined in Article VIII.A.5.c of the Combined Plan and Disclosure Statement, SuiteKey Claimants will be entitled to certain "Credits" towards future flights with the Delux.  Subject to the discussion *infra*, the DIP Lenders are offering full credit on flights with Delux for up to 15% of any SuiteKey Claimant's existing balance with the Debtor.  The Debtor estimates that there are approximately $50 million in potential SuiteKey Claims against the Debtor; thus, in addition to the DIP Lenders' contribution of the GUC Plan Consideration to the GUC Trust, agreeing to subordinate the entirety of the JetSuiteX Unsecured Demand Notes, and the MSA Reconciliation Payment, the DIP Lenders are contributing a maximum of $7.5 million ($50 million x 15%)[13] worth of Credits for the benefit of the Debtor's creditors.

In sum, the DIP Lenders' contribution of (i) the GUC Plan Consideration (estimated to be approximately $1.0 million, in addition to approximately $2.6 million of advances under the DIP Credit Facility used to administer this case), (ii) the JetSuiteX Unsecured Demand Notes subordination ($16 million), (iii) the MSA Reconciliation Payment ($224,000), and (iv) the Credits (a maximum value of $7.5 million), represents a combined value to the Debtor's creditors of approximately $24.7 million.

## C.    Certain Federal Income Tax Consequences

The following discussion is a summary of certain material United States federal income tax consequences of the consummation of this Combined Disclosure Statement and Plan to the Debtor and certain holders of Claims.  It is for general information purposes only and should not be relied upon for purposes of determining the specific tax consequences of the Combined Disclosure Statement and Plan with respect to a particular holder of a Claim or Equity Interest.  This discussion is provided for information purposes and does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), proposed Treasury Regulations promulgated thereunder, administrative rulings and practice of the U.S. Internal Revenue Service (the "**IRS**"), other applicable authorities, and court decisions, all as in effect on the date hereof.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Combined Disclosure Statement and Plan.  Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Combined Disclosure Statement and Plan.  To the extent that the following discussion relates to the consequences to holders of Allowed Claims or Equity Interests, it is limited to holders that are United States persons within in the meaning of the IRC.  For purposes of the following discussion, a "United States person" is any of the following:

---

[13] As discussed further *infra*, the final number of SuiteKey Claimants that opt for treatment as a SuiteKey Claimant versus treatment as a General Unsecured Claimant will not be known until the Voting Deadline has elapsed.

- An individual who is a citizen or resident of the United States;
- A corporation created or organized under the laws of the United States or any state or political subdivision thereof;
- An estate, the income of which is subject to federal income taxation regardless of its source; or
- A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

The federal income tax consequences of the Combined Disclosure Statement and Plan are complex and are subject to significant uncertainties. No ruling has been or will be requested or obtained from the IRS with respect to any tax aspects of the Combined Disclosure Statement and Plan and no opinion of counsel has been or will be sought or obtained with respect thereto. Thus, no assurance can be given as to whether the IRS will agree with the assertions and conditions discussed herein. No representations or assurances are being made to the holders of Claims or Equity Interests with respect to the United States federal income tax consequences described herein. In addition, this summary does not address foreign, state or local tax consequences of the Combined Disclosure Statement and Plan. This discussion does not address all aspects of U.S. federal income taxation that may be relevant to the Debtor or a particular holder in light of its particular facts and circumstances, or to certain types of holders subject to special treatment under the IRC or other applicable tax rules or regulations (such as governmental entities, banks, mutual funds, insurance companies, broker-dealers, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, holders that are or hold their Claims through a partnership or other pass-through entities (including subchapter S corporations), persons using a mark-to-market method of accounting, persons who are related to the Debtor within the meaning of the IRS, dealers in securities and foreign currencies, persons that have a functional currency other than the U.S. dollar, persons holding or that will hold Claims or retained Membership Interests as part of a hedge, straddle, constructive sale, conversion or other integrated transaction and holders of Claims who are themselves in bankruptcy), nor does it address any tax consequences related to the holding or disposition of retained Membership Interests. This discussion does not address the state, local, estate, gift or foreign tax consequences of the Combined Disclosure Statement and Plan and does not address the U.S. federal income tax consequences to Holders of Claims that are unimpaired under the Combined Disclosure Statement and Plan or Holders of Claims that are not entitled to receive or retain any property under the Combined Disclosure Statement and Plan. Furthermore, this discussion assumes that holders of Claims hold only Claims in a single Class and hold each Claim as a "capital asset" (within the meaning of Section 1221 of the IRC). Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

Any discussion of United States federal tax issues set forth in this Combined Disclosure Statement and Plan is written solely in connection with the confirmation of the same. A holder of a Claim or Equity Interest should seek advice based on their particular circumstances from an independent tax advisor.

**EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

D.    **Alternative Plan**

If the Combined Disclosure Statement and Plan is not confirmed, the Debtor, the Committee, the DIP Lenders or any other party in interest could attempt to formulate a different plan. However, the additional costs of formulating a different plan—all of which would constitute Administrative Expense Claims—may be so significant that one or more parties in interest could request that the Chapter 11 Case be converted to a case under chapter 7 of the Bankruptcy Code.  Accordingly, the Debtor believes that the Combined Disclosure Statement and Plan enables creditors to realize the best return under the circumstances.

E.    **Best Interests Test and Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an impaired Claim or Equity Interest either (a) accept the Combined Disclosure Statement and Plan or (b) receive or retain under the Combined Disclosure Statement and Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. A hypothetical chapter 7 liquidation analysis is attached to this Combined Disclosure Statement and Plan as Exhibit A. The value of any Distributions if the Debtor's Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Combined Disclosure Statement and Plan for a variety of reasons. Conversion of the Chapter 11 Case to a chapter 7 case would require the appointment of a chapter 7 trustee, who would be entitled to statutory fees relating to the Distributions of the already-monetized assets. Accordingly, a portion of the Cash currently available, or that would be available upon the Effective Date under the Plan, for Distribution to Holders of Allowed Claims would instead have to be paid to a chapter 7 trustee. In addition, the chapter 7 trustee would likely retain new professionals. The "learning curve" that the trustee and new professionals would be faced with comes with potentially additional costs to the Estate and with a delay compared to the time of Distributions under the Combined Disclosure Statement and Plan.

The DIP Lenders agreed to, *inter alia*,  allow the Debtor to use their cash collateral to provide for the payment of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, Allowed Professional Claims, pursuant to an Approved Budget and to fund the GUC Trust.  Although this consideration was assumed in the chapter 7 liquidation analysis, there are no assurances that this would be available in a hypothetical chapter 7 liquidation.  In any event, the conversion to a

chapter 7 case would likely require the chapter 7 trustee to negotiate with the DIP Lenders to honor any such commitments, resulting in additional costs and administrative expenses incurred in connection therewith, as well as a resulting delay in Distributions.

As a result, the Debtor believes that the Estate would have fewer funds to be distributed in a hypothetical chapter 7 liquidation than it would if the Combined Disclosure Statement and Plan is confirmed. Moreover, based on the structure of the Combined Disclosure Statement and Plan, and the settlements contained therein, the Holders of Allowed General Unsecured Claims will recover more under the Combined Disclosure Statement and Plan than in the hypothetical chapter 7 case. Accordingly, the Debtor believes that the Combined Disclosure Statement and Plan satisfies the "best interests" test of Bankruptcy Code section 1129.

### F.      Releases by the Debtor and Third Parties

The release provisions set forth in Articles XII.B and XII.C of this Combined Disclosure Statement and Plan are an integral part of this Combined Disclosure Statement and Plan.  Absent such releases, the DIP Lenders would not have agreed to the terms of this Combined Disclosure Statement and Plan and the Holders of Allowed Claims would receive a diminished (or, in some cases, no) recovery on account of such Claims.

### G.      Administrative and Priority Claim Reserve

As soon as practicable, the Debtor or Reorganized Debtor, as applicable shall establish and fund from the DIP Commitment the Administrative and Priority Claim Reserve in an amount to be determined in good faith with the Committee or GUC Trust, as applicable.  Funds, if any, remaining in the Administrative and Priority Claim Reserve shall be remitted to the GUC Trustee and shall become part of the GUC Trust Reserve.

### IV.      SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

### A.      Summary of Treatment of Claims and Equity Interests and Estimated Recoveries

The following chart provides a summary of treatment of each Class of Claims and Equity Interests (other than Administrative Expense Claims, Priority Tax Claims and Professional Claims) and an estimate of the recoveries of each Class.[14] The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article VIII of this Combined Disclosure Statement and Plan.

---

[14] These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by Creditors in proofs of claim or otherwise. The Debtor has not completed its analysis of Claims in the Chapter 11 Case and objections to such Claims have not been fully litigated. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

| Class | Estimated Allowed Claims | Treatment / Voting Status | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1—DIP Facility Claims | $2,450,000.00 | Unimpaired / Deemed to Accept | *See* Article VIII.A.1 |
| Class 2—Other Secured Claims | $0.00 | Unimpaired / Deemed to Accept | 100.00% |
| Class 3—Other Priority Claims | $0.00 | Unimpaired / Deemed to Accept | N/A |
| Class 4—General Unsecured Claims | $8,500,000.00 | Impaired / Entitled to Vote | 2.3% to 15.0% |
| Class 5—SuiteKey Claims | $49,500,000.00 | Impaired / Entitled to Vote | If opting for treatment as a Class 4 General Unsecured Claim, then cash in the amount of 2.3% to 15% of the SuiteKey Claimant's allowed SuiteKey Claim<br><br>If opting for treatment as a Class 5 SuiteKey Claimant, flight Credits equal to the greater of (i) 15% of the allowed amounts of a given SuiteKey Claim or (ii) $3,025; provided, however, that any allowed SuiteKey Claim less than $3,025.00 shall have Credits equal to their allowed claim |
| Class 6—Subordinated Claims | $16,000,000.00 | Impaired / Deemed to Reject | 0% |
| Class 7—Existing Equity Interests | N/A | Unimpaired / Deemed to Accept | Reinstated as directed by the DIP Lenders for the consideration provided to implement the Combined Plan and Disclosure Statement. |

## V.  CONFIRMATION AND VOTING PROCEDURES

### A.  Confirmation Procedure

#### 1.  Confirmation Hearing

On July 20, 2020 the Bankruptcy Court entered an Order [D.I. 165] (the "**Conditional Approval and Procedures Order**") conditionally approving the Combined Disclosure Statement for solicitation purposes only and authorizing the Debtor to solicit acceptances of the

Combined Disclosure Statement and Plan. The Confirmation Hearing has been scheduled for **September 3, 2020 at 2:00 p.m.** at the Bankruptcy Court, 824 North Market Street, 5th Floor, Courtroom 6, Wilmington, Delaware 19801 to consider (i) final approval of the Combined Disclosure Statement and Plan as providing adequate information as required by section 1125 of the Bankruptcy Code and (ii) confirmation of the Combined Disclosure Statement and Plan under section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

## 2. Procedure for Objections

Any objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information as required by section 1125 of the Bankruptcy Code and/or confirmation of the Combined Disclosure Statement and Plan must be made in writing and Filed with the Bankruptcy Court and served on (i) counsel to the Debtor, Bayard, P.A., 600 North King Street, Suite 400, Wilmington, Delaware 19801 (Attention: Evan T. Miller, Esq.), E-Mail: emiller@bayardlaw.com; (ii) counsel to the Official Committee of Unsecured Creditors, Troutman Pepper Hamilton Sanders LLP, 1313 N. Market Street, Suite 5100, Wilmington, DE 19801, (Attention: David B. Stratton, Esq. and Evelyn J. Meltzer, Esq.), E-Mail: david.stratton@troutman.com and evelyn.meltzer@troutman.com; (iii) counsel to the DIP Lenders, (a) Vedder Price P.C., 1633 Broadway, 31st Floor, New York, New York 10019, (Attention: Michael J. Edelman, Esq. & Jeremiah Vandermark, Esq.), E-Mail: MJEdelman@VedderPrice.com and & JVandermark@VedderPrice.com; 222 North LaSalle Street, Chicago, Illinois 60601 (Attention: Douglas J. Lipke, Esq.), E-Mail: DLipke@VedderPrice.com; (b) Potter Anderson & Corroon LLP, 1313 N. Market Street, Sixth Floor, Wilmington, DE 19801 (Attention: Jeremy W. Ryan, Esq.), E-Mail: jryan@potteranderson.com; and (iv) the United States Trustee for Region 3, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attention: Benjamin A. Hackman), E-Mail: benjamin.a.hackman@usdoj.gov, in each case, by no later than **August 27, 2020 at 4:00 p.m. (ET). Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.**

## 3. Requirements for Confirmation

The Bankruptcy Court will confirm the Combined Disclosure Statement and Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Combined Disclosure Statement and Plan (i) must be accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, the Combined Disclosure Statement and Plan must not "discriminate unfairly" against and be "fair and equitable" with respect to such Class; and (ii) must be feasible. The Bankruptcy Court must also find that:

> a. the Combined Disclosure Statement and Plan has classified Claims and Equity Interests in a permissible manner;
>
> b. the Combined Disclosure Statement and Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

c.    the Combined Disclosure Statement and Plan has been proposed in good faith.

### 4.    Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires the Combined Disclosure Statement and Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such class. The Combined Disclosure Statement and Plan creates separate Classes to deal respectively with secured Claims, unsecured Claims and Equity Interests. The Debtor believes that the Combined Disclosure Statement and Plan's classifications place substantially similar Claims or Equity Interests in the same Class and thus, meet the requirements of section 1122 of the Bankruptcy Code.

### B.    Voting Procedure

### 1.    Impaired Claims or Equity Interests

Section 1126 of the Bankruptcy Code provides that only the Holders of Claims in Classes impaired by the Combined Disclosure Statement and Plan and receiving a payment or Distribution under the Combined Disclosure Statement and Plan may vote on the Combined Disclosure Statement and Plan. Section 1124 of the Bankruptcy Code provides that a Class of Claims may be impaired if the Combined Disclosure Statement and Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests treated in such Class. The Holders of Claims in Classes not impaired by the Combined Disclosure Statement and Plan are deemed to accept the Combined Disclosure Statement and Plan and do not have the right to vote on the Combined Disclosure Statement and Plan. The Holders of Claims or Equity Interests in any Class which will not receive any payment or Distribution or retain any property under the Combined Disclosure Statement and Plan are deemed to reject the Combined Disclosure Statement and Plan and do not have the right to vote. Finally, the Holders of Claims or Equity Interests whose Claims or Equity Interests are not classified under the Combined Disclosure Statement and Plan are not entitled to vote on the Combined Disclosure Statement and Plan.

### 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Combined Disclosure Statement and Plan). For the purposes of determining whether the Debtor's plan meets this requirement, the Debtor has analyzed the ability of the Reorganized Debtor and the GUC Trustee to meet their obligations under the Combined Disclosure Statement and Plan.  Based on its analysis, the Debtor believes that the terms of the Plan meets the financial feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code. Moreover, the Debtor believes that sufficient funds will exist to make all payments required by the Plan.  Specifically, by retaining its assets—notably, the Purchased and Financed Aircraft and the Part 135 Certificate—but transferring the obligations to provide services to SuiteKey

members to Delux, the Debtor can pause its operations until market and other conditions make a resumption of operations feasible.  Accordingly, the Debtor is confident that it will have sufficient means to provide for the distributions under the Plan and, therefore, believes that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code.

### 3.    Eligibility to Vote on the Combined Disclosure Statement and Plan

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Classes 4 and 5 may vote on the Combined Disclosure Statement and Plan. Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order, in order to vote on the Combined Disclosure Statement and Plan, you must hold an Allowed Claim in Class 4 or Class 5 or be the Holder of a Claim in either such Class that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

### 4.    Solicitation Notice

All Holders of Allowed Claims in in Class 4, or Class 5 will receive (i) notice of the Confirmation Hearing on the Combined Disclosure Statement and Plan (the "**Confirmation Notice**") and (ii) a form of ballot. All other Creditors and parties in interest not entitled to vote on the Combined Disclosure Statement and Plan will only receive a copy of the Confirmation Notice.

### 5.    Procedure/Voting Deadlines

In order for your ballot to count, you must either (1) complete an electronic ballot at http://cases.stretto.com/superiorair or (2) complete, date, sign and properly mail, courier or personally deliver a paper ballot (please note that envelopes are not included with the ballot) to the Claims and Noticing Agent at the following address: Superior Air Charter, LLC, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.

Ballots must be submitted electronically, or the Claims and Noticing Agent must RECEIVE physically original ballots by mail or overnight delivery, on or before **August 27, 2020 at 4:00 p.m. (prevailing Eastern Time)** (the "**Voting Deadline**"). Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a ballot is submitted electronically or the Claims and Noticing Agent receives your original paper ballot.

Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Disclosure Statement and Plan.

### 6.    Acceptance of the Combined Disclosure Statement and Plan

As a Creditor, your acceptance of the Combined Disclosure Statement and Plan is important. In order for the Combined Disclosure Statement and Plan to be accepted by an impaired Class of Claims, a majority in number (*i.e.*, more than half) and at least two-thirds in dollar amount of the Claims voting (of each impaired Class of Claims) must vote to accept the

Combined Disclosure Statement and Plan. At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Disclosure Statement and Plan. The Debtor urges that you vote to accept the Combined Disclosure Statement and Plan. **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY SUBMIT YOUR BALLOT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

### 7.    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Combined Disclosure Statement and Plan for all purposes, including for purposes of determining acceptance of the Combined Disclosure Statement and Plan by such Class under Section 1129(a)(8) of the Bankruptcy Code.

## VI.    TREATMENT OF UNCLASSIFIED CLAIMS

### A.    Administrative Expense Claims

Except to the extent that any Entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the Effective Date or seven (7) Business Days after the entry of a Final Order Allowing such Administrative Expense Claim, or as soon thereafter as is practicable. Such payments to Holders of Allowed Administrative Expense Claims shall be paid by the GUC Trustee from the Administrative and Priority Claim Reserve. Objections to Administrative Expense Claims must be Filed and served on the GUC Trustee and the requesting party no later than 120 days after the Effective Date, unless such objection deadline is extended by order of the Bankruptcy Court upon the motion of the GUC Trustee (the "**Administrative Expense Claim Objection Deadline**").    Nothing in this Plan shall extend or be deemed to extend the deadline of July 27, 2020 previously fixed by the Bar Date Order for Filing claims under section 503(b)(9) of the Bankruptcy Code.

### B.    Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim, if any, shall receive in full satisfaction of such Allowed Priority Tax Claim (a) payment in Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the Effective Date or within seven (7) Business Days after such Allowed Priority Tax Claim becomes an Allowed Claim, whichever is later, or as soon thereafter as is practicable; or (b) Cash in an amount agreed to by the GUC Trustee and such Holder. Such payments to Holders of Allowed Priority Tax Claims shall be paid by the Debtor (or the GUC Trustee, as applicable) from the Administrative and Priority Claim Reserve.

### C.  Professional Claims

#### 1.  Payment of Professional Claims

All Professionals seeking allowance by the Bankruptcy Court of a Professional Claim shall be paid in full in Cash in such amounts as are approved by the Bankruptcy Court upon (i) the later of (x) the Effective Date and (y) fourteen (14) days after the date upon which the order relating to the allowance of any such Allowed Professional Claim is entered or (ii) such other terms as may be mutually agreed upon between the Holder of such Professional Claim and the Debtor or the GUC Trustee, as applicable.

#### 2.  Professional Fee Reserve

As soon as practicable, the Debtor, from the DIP Commitment, shall establish and fund the Professional Fee Reserve in an amount determined in good faith with the Committee.  The Professional Fee Reserve shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtor's Estate. The amount of Allowed Professional Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Reserve.  Funds, if any, remaining in the Professional Fee Reserve after payment in full of all Allowed Professional Claims shall be remitted to the GUC Trustee and shall become part of the GUC Trust Reserve.

#### 3.  Allocation and Estimation of Professional Claims

Professionals providing services to the Debtor shall reasonably estimate their unpaid Professional Claims against the Debtor relating to the period prior to and through the Effective Date and shall deliver such estimate to the Debtor by two (2) Business Days prior to the Effective Date; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional.

#### 4.  Timing for Filing Professional Claims

All requests for compensation or reimbursement of Professionals retained in this Chapter 11 Case for services performed and expenses incurred prior to the Effective Date shall be Filed and served on: (i) the Debtor, c/o 1341 W. Mockingbird Lane, Suite 600E, Dallas, Texas 75247; (ii) counsel to the Debtor, Bayard, P.A., 600 North King Street, Suite 400, Wilmington, Delaware 19801 (Attention: Evan T. Miller, Esq.), E-Mail: emiller@bayardlaw.com; (iii) counsel to the Official Committee of Unsecured Creditors, Troutman Pepper Hamilton Sanders LLP, 1313 N. Market Street, Suite 5100, Wilmington, DE 19801, (Attention: David B. Stratton, Esq. and Evelyn J. Meltzer, Esq.), E-Mail: david.stratton@troutman.com and evelyn.meltzer@troutman.com; (iv) counsel to the DIP Lenders, (a) Vedder Price P.C., 1633 Broadway, 31st Floor, New York, New York 10019, (Attention: Michael J. Edelman, Esq. & Jeremiah Vandermark, Esq.), E-Mail: MJEdelman@VedderPrice.com and & JVandermark@VedderPrice.com; 222 North LaSalle Street, Chicago, Illinois 60601 (Attention: Douglas J. Lipke, Esq.), E-Mail: DLipke@VedderPrice.com; (b) Potter Anderson & Corroon LLP, 1313 N. Market Street, Sixth Floor, Wilmington, DE 19801 (Attention: Jeremy W. Ryan, Esq.), E-Mail:

jryan@potteranderson.com; and (v) the United States Trustee for Region 3, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attention: Benjamin A. Hackman), E-Mail: benjamin.a.hackman@usdoj.gov; and (iv) such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other Order of the Bankruptcy Court, by no later than forty-five (45) days after the Effective Date, unless otherwise agreed by the GUC Trustee, or extended by order of the Bankruptcy Court; provided, however, that any Professional who may receive compensation or reimbursement of expenses under the Ordinary Course Professionals Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court Order, under the Ordinary Course Professional Order.  Objections to any Professionals Claim must be Filed and served on the GUC Trustee and the requesting party no later than sixty-five (65) days after the Effective Date, unless otherwise ordered by the Court (the "**Professional Claims Objection Deadline**").

### 5.     Post-Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the GUC Trust Agreement, the GUC Trustee may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to, or action, Order, or approval of, the Court.

### D.     Payment of Statutory Fees.

All fees due and payable under section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid in full in cash by the Debtor on the Effective Date. After the Effective Date, the GUC Trustee shall pay in full in cash any and all such fees when due and payable until the Debtor's case is converted, dismissed, or closed, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Notwithstanding anything else in the Plan, the United States Trustee shall not be required to file a proof of claim for quarterly fees.  Interest, if any, on quarterly fees shall be paid pursuant to 31 U.S.C. § 3717.  Notwithstanding anything else in this Plan to the contrary, nothing in this Plan shall release, discharge, or enjoin the enforcement of liability for quarterly fees.

### VII.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS; ESTIMATED RECOVERIES

Equity Interests and Claims, other than Administrative Expense Claims and Priority Tax Claims, are classified for all purposes, including voting, confirmation and Distribution by the Combined Disclosure Statement and Plan, as follows:

| Class | Type | Status Under Plan | Voting Status |
|-------|------|-------------------|---------------|
| 1 | DIP Facility Claims | Unimpaired | Deemed to Accept |

| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | SuiteKey Claims | Impaired | Entitled to Vote |
| 6 | Subordinated Claims | Impaired | Deemed to Reject |
| 7 | Existing Equity Interests | Unimpaired | Deemed to Accept |

## VIII.  TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.  Treatment of Claims

#### 1.  Class 1—DIP Facility Claims

a.  *Classification*

Class 1 consists of the DIP Facility Claims, which shall be Allowed in the aggregate amount of $2,450,000.00, as of the Effective Date.

b.  *Impairment and Voting*

Class 1 is unimpaired by the Combined Disclosure Statement and Plan. Holders of Class 1 Claims are deemed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c.  *Treatment*

Except to the extent that the Holders of the DIP Facility Claims agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the DIP Facility Claims, (i) the DIP Lenders or their assignee shall acquire, free and clear of all Liens, Claims, encumbrances and interests, all property comprising the Estate as detailed in Section III.B.8; and (ii) the Equity Interests in the Debtor shall not be canceled and instead shall continue to be held in affiliate JSI.

2.    **Class 2—Other Secured Claims**

a.    *Classification*

Class 2 consists of the Other Secured Claims.

b.    *Impairment and Voting*

Class 2 is unimpaired by the Combined Disclosure Statement and Plan. Holders of Class 2 Claims are deemed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c.    *Treatment*

Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practical after, the Effective Date or the date such Claim becomes an Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, as the Debtor or the GUC Trustee, as applicable, determines, (i) Cash in an amount equal to such Allowed Other Secured Claim or (ii) such other treatment that renders such Holder's Allowed Other Secured Claim unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

3.    **Class 3—Other Priority Claims**

a.    *Classification*

Class 3 consists of Other Priority Claims.

b.    *Impairment and Voting*

Class 3 is unimpaired by the Combined Disclosure Statement and Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c.    *Treatment*

Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim.

4.    **Class 4—General Unsecured Claims**

a.    *Classification*

Class 4 consists of General Unsecured Claims.

b.    *Impairment and Voting*

Class 4 is impaired by the Combined Disclosure Statement and Plan. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c.    *Treatment*

Holders of Allowed General Unsecured Claims shall receive a pro rata distribution of the GUC Trust Proceeds in full satisfaction of their Claims, which Claims shall not be assumed by, and are extinguished and discharged against the Reorganized Debtor.

**5.    Class 5—SuiteKey Claims**

a.    *Classification*

Class 5 consists of SuiteKey Claims.

b.    *Impairment and Voting*

Class 5 is impaired by the Combined Disclosure Statement and Plan. Holders of Allowed SuiteKey Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c.    *Treatment*

Holders of Allowed SuiteKey Claims shall be given the option of electing to be treated as a Class 4 General Unsecured Claim, entitling it to a pro rata distribution of the GUC Trust Proceeds on the basis of the amount of their Allowed SuiteKey Claim.

Alternatively, SuiteKey Claimants may opt for treatment under Class 5, entitling them to the following recovery: credits (the "**Credits**") to be used against future flights hosted by Delux or its successor.  The Credits shall be the greater of (i) 15% of the allowed amount of a given SuiteKey Claimant's Allowed SuiteKey claim or (ii) $3,025.00; provided, however that any holder of a SuiteKey Claim Allowed in an amount less than $3,025.00 shall have Credits equal to their entire Allowed SuiteKey Claim.  The first 2% of Credits, based on a given SuiteKey Claimant's Allowed SuiteKey Claim, (a) shall be usable on any publicly available airfare tickets on JSX.com, (b) must be used on or before the earlier of six (6) months after the Effective Date of the Combined Plan and Disclosure Statement or February 28, 2021, (c) cannot be sold or transferred, (d) cannot be used on a Friday, Sunday or Holiday, (e) such Credits shall be limited to use for up to six available seats per flight, and (f) cannot be used to book a flight that is more than two-thirds booked at the time the Claimant makes the booking.[15]  Thereafter, the remaining 13% of Credits, based on a given SuiteKey Claimants' Allowed Claim, shall be usable in the

---

[15] For illustrative purposes, if a holder of SuiteKey Claim has an allowed $100,000 SuiteKey Claim, then the claimant would receive $15,000 in aggregate Credits.  The first two percent (2%) of that amount ($3,000) would be available for booking flights on JSX.com, and must be used in the first six (6) months after the Effective Date.

form of the following discounts on any publicly available airfare tickets on JSX.com: (i) 55% off to be used on or before the earlier of twelve (12) months after the Effective Date of the confirmed Combined Plan and Disclosure Statement or August 31, 2021 (the "**Initial Discount Period**"); and (ii) 32.5% off to be used on or before the earlier of twelve (12) months to twenty four (24) months after the Effective Date of the confirmed Combined Plan and Disclosure Statement or August 31, 2022 (the "**Remaining Discount Period**").[16]  Such discounts shall be made available to corporate SuiteKey Claimants with the right to designate the use of such discounts to any current employee(s), or in the case of a non-corporate SuiteKey Claimant the one-time right to designate the use of such discounts to any immediate family member or two designees to be identified in writing[17] within sixty (60) days of the Effective Date of the Combined Plan and Disclosure Statement.  SuiteKey Claimants shall be permitted one-time to sell or transfer their Credits to another SuiteKey member with the consent of Delux or its successor,[18] which consent shall not be unreasonably withheld or delayed and if not approved within sixty (60) days of the Effective Date of the Combined Plan and Disclosure Statement shall be deemed approved.  All fare rules shall apply except that any ticket purchased becomes non-refundable upon initial purchase, with only one change per itinerary allowed.  Delux or its successor shall have the right to terminate Credits or discounts held by any valid holder to the extent fraud is discovered in the attempted use or breach of the terms of use of such Credit.

Delux is a "hop-on" jet service that customers have typically found to be faster on the ground, more comfortable in the air, and more competitively priced than commercial non-stop flights.  Delux is committed to providing a safe, simple, and secure travel experience and has recently introduced new sterilization and contactless protocols to guarantee the comfort and confidence of its passengers every time they fly.

Recently honored by Fast Company as one of the "Most Innovative Companies" of 2020, Delux offers many industry-leading features including (i) allowing customers to arrive as few as twenty minutes before departure by flying from private terminals, (ii) no long security or check-in lines, (iii) 30-seat jets with business class legroom, (iv) touch-free thermal scan and weapons detections, (v) sterilized lounges and aircraft, (vi) state-of-the-art air filtration onboard, and (vii) free amenities such as bags, snacks, and cocktails.  Flights can be booked quickly and seamlessly via www.jsx.com or through the JSX mobile app.

Delux currently operates regular, daily flights from seven destinations along the West Coast and beyond, including Burbank, Santa Ana, the Bay Area, Las Vegas, Phoenix, and Seattle.  Seasonally, Delux offers flights to popular leisure locations such as Monterey and Mammoth Mountain and exclusive travel packages with renowned brands such as Wynn Las Vegas and Pinehurst Resorts.  Rates on Delux flights range from $89 to $800 each way, and

---

[16] For illustrative purposes, the same holder of an allowed $100,000 SuiteKey Claim would still have twelve percent (12%) of their SuiteKey Claim Credits remaining ($12,000).  Those remaining Credits may be used for a discount of 55% off of flights if used in the first twelve (12) months following the Effective Date (e.g., on a $1,000 flight, a SuiteKey Claimant could reduce the cost by $550); or 32.5% off of flights if used between twelve (12) and twenty four (24) months following the Effective Date (e.g., on a $1,000 flight, a SuiteKey Claimant could reduce the cost by $325).

[17] Such notice shall be provided by e-mail to sacskcredits@jetsuite.com.

[18] Such notice shall be provided by e-mail to sacskcredits@jetsuite.com.

conditions may apply. Additional information regarding Delux destinations can be found at https://www.jsx.com/destinations.

As of June 15, 2020, consumer demand for travel at Delux is resuming in certain markets. Assuming that trend continues, and no adverse legal, regulatory or market action related to the pandemic or otherwise occurs, Delux is cautiously optimistic it will continue to be in a position to provide the described services. Furthermore, Delux applied for and received limited CARES Funding; in the event that the effects of the pandemic further suppress travel demand, Delux may have to seek additional government support for its continued operations. While it is impossible to guarantee or predict with any certainty the effect and timing of the pandemic on any domestic commercial airlines (including United, American, Delta, Southwest, among others), Delux is off to a good start and continues to be cautiously optimistic that its business plan, as stated above, will work going forward.[19]

### 6.    Class 6—Subordinated Claims

a.    *Classification*

Class 6 consists of Subordinated Claims.

b.    *Impairment and Voting*

Class 6 is impaired, and Holders of Class 6 Subordinated Claims are not entitled to receive or retain any property under the Combined Disclosure Statement and Plan on account of their Subordinated Claims. Therefore, Holders of Class 6 Subordinated Claims are deemed to have rejected the Combined Disclosure Statement and Plan by operation of section 1126(g) of the Bankruptcy Code, and Holders of Class 6 Subordinated Claims are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c.    *Treatment*

Holders of Allowed Subordinated Claims shall not receive any distributions under the Combined Disclosure Statement and Plan.

### 7.    Class 7—Existing Equity Interests

a.    *Classification*

Class 7 consists of the Equity Interests in the Debtor.

---

[19] For the avoidance of doubt, the foregoing description of Delux and its services, rates, and destinations have been provided only as marketing material for the limited purpose of assisting SuiteKey Claimants in making their decisions whether to elect treatment as a Holder of a Class 4 General Unsecured Claim or Class 5 SuiteKey Claim. The description of Delux and its services contained in this Combined Disclosure Statement and Plan shall not be construed as a representation or warranty regarding future services, which could end at any time for any reason.

b.      *Impairment and Voting*

Class 7 is unimpaired by the Combined Disclosure Statement and Plan.  Holders of Class 7 Claims are conclusively presumed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c.      *Treatment*

On the Effective Date, JSI will continue to own 100% of all existing Equity Interests in the Debtor as directed by the DIP Lender for the consideration provided to implement the Combined Plan and Disclosure Statement.

## B.      Modification of Treatment of Claims and Equity Interests

The Debtor or the GUC Trustee, as applicable, reserves the right to modify the treatment of any Allowed Claim in any manner adverse only to the Holder of such Claim at any time after the Effective Date upon the consent of the Holder of the Claim whose Allowed Claim, as the case may be, is being adversely affected.

## C.      Cramdown and No Unfair Discrimination

In the event that any impaired Class of Claims or Equity Interests rejects the Combined Disclosure Statement and Plan or is deemed to have rejected the Combined Disclosure Statement and Plan, the Debtor hereby requests, without any delay in the occurrence of the Confirmation Hearing or Effective Date, that the Bankruptcy Court confirm the Combined Disclosure Statement and Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Combined Disclosure Statement and Plan shall constitute a motion for such relief.  The Debtor reserves all rights to modify the treatment of the equity of the Reorganized Debtor in the event an impaired Class votes to reject the Plan.

Confirming the Combined Disclosure Statement and Plan under such a circumstance is what is known as a "cramdown". Among other things, a "cramdown" is appropriate where the Bankruptcy Court finds that it does not unfairly discriminate against the objecting Classes and is fair and equitable with respect to those objecting Classes. A plan unfairly discriminates against a Class if another Class of equal rank in priority will receive greater value under the plan than the nonaccepting Class without reasonable justification. A plan is fair and equitable if no claim or interest junior to the objecting Class shall receive or retain any claim or interest under the plan.

## IX.    PROVISIONS REGARDING THE GUC TRUSTEE

## A.      Appointment of the GUC Trustee

On the Effective Date, a GUC Trustee, who shall be selected by the Committee, shall be appointed and thereafter serve in accordance with this Combined Disclosure Statement and Plan. The GUC Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. As soon as practicable after the Voting Deadline, as part of the Plan Supplement, the Debtor shall File with

the Bankruptcy Court a notice identifying the GUC Trustee and, if the GUC Trustee is deemed an "insider", as defined by section 101(31) of the Bankruptcy Code, the material terms of the GUC Trustee's compensation.

**B.**     **Rights and Powers of the GUC Trustee**

The GUC Trustee shall, in addition to any powers and authority specifically set forth in other provisions of the Combined Disclosure Statement and Plan, be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Combined Disclosure Statement and Plan, (ii) establish, as necessary, disbursement accounts for the deposit and distribution of all amounts distributed under the Combined Disclosure Statement and Plan, (iii) make Distributions in accordance with the Combined Disclosure Statement and Plan, (iv) object to Claims to the extent not otherwise objected to by the Debtor prior to the Effective Date, (v) employ and compensate professionals to represent it with respect to its responsibilities, and (vi) exercise such other powers as may be vested in the GUC Trustee by order of the Bankruptcy Court, under the Combined Disclosure Statement and Plan, or as deemed by the GUC Trustee to be necessary and proper to implement the provisions hereof. The GUC Trustee may take any and all actions which it deems reasonably necessary or appropriate to defend against any Claim, including, without limitation, the right to: (a) exercise any and all judgment and discretion with respect to the manner in which to defend against or settle any Claim, including, without limitation, the retention of professionals, experts and consultants; and (b) enter into a settlement agreement or agreements without Bankruptcy Court approval.  Upon the later of the Effective Date and the appointment of the GUC Trustee, the Debtor will have no other officers, directors or managers.

**C.**     **Post Effective Date Expenses of the GUC Trustee**

The GUC Trustee shall receive reasonable compensation for services rendered in connection with the Combined Disclosure Statement and Plan without further Court order. In addition, the amount of reasonable fees and expenses incurred by the GUC Trustee on or after the Effective Date (including, without limitation, reasonable attorney and professional fees and expenses) may be paid without further Court order. The GUC Trustee shall be paid from the GUC Trust Reserve as further set forth herein and in the GUC Trust Agreement. Any amounts remaining in the GUC Trust Reserve at the closing of the Chapter 11 Case, after payment in full of all fees, costs and expenses related to the GUC Trust, shall, subject to Article X.R., be distributed to Class 4 Holders of Allowed General Unsecured Claims, as set forth in Article VIII.A.4 herein.

As may be more fully set forth in the GUC Trust Agreement, the GUC Trustee Activities, and all such other fees, costs and expenses of the GUC Trustee, shall be funded from the GUC Trust Reserve.

**D.**     **GUC Trust Agreement**

A form of the GUC Trust Agreement shall be Filed as part of the Plan Supplement. Among other things, the GUC Trust Agreement shall contain reasonable and customary provisions consistent with the Combined Disclosure Statement and Plan, reasonably acceptable to the Debtor, the DIP Lenders, and the Committee, to govern the GUC Trust.

40

## X.    PROVISIONS GOVERNING DISTRIBUTIONS UNDER
## THE COMBINED DISCLOSURE STATEMENT AND PLAN

### A.    Method of Payment

Unless otherwise expressly agreed, in writing, all Cash payments to be made under the Combined Disclosure Statement and Plan shall be made by check drawn on a domestic bank or by an electronic wire transfer.

### B.    Objections to and Resolution of Claims

Except with respect to Professionals Claims, the GUC Trustee shall have the right to File objections and/or motions to estimate any and all Claims after the Effective Date.  The GUC Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw its objections to any and all Claims, without approval of the Bankruptcy Court.  The United States Trustee's right to object to claims is reserved.

### C.    Claims Objection Deadline

Except as otherwise set forth in Article VI.C.4 above with respect to Professionals Claims, the GUC Trustee shall File and serve any objection to any Claims no later than the Claims Objection Deadline; provided, however, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the GUC Trustee.

### D.    Late Claims and Amendments to Claims After the Confirmation Date

Except as provided herein or otherwise agreed, any and all Holders of proofs of claim Filed after the applicable Bar Date shall not be treated as creditors for purposes of Distribution pursuant to Bankruptcy Rule 3003(c)(2) and the Bar Date Order unless on or before the Confirmation Date such late Claim has been deemed timely Filed by a Final Order.  After the Confirmation Date, a proof of claim may not be Filed or amended without the authorization of the Bankruptcy Court.

### E.    No Distribution Pending Allowance

Notwithstanding any other provision of the Combined Disclosure Statement and Plan, no payment or Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by this Combined Disclosure Statement and Plan.

### F.    Estimation

The GUC Trustee may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the GUC Trustee has previously objected to such Claim.  In the event the Bankruptcy Court estimates any Disputed Claim, the estimated amount may constitute a maximum limitation on such Claim, as determined by the Bankruptcy Court.  Notwithstanding this, the GUC Trustee

may elect to pursue any supplemental proceedings to object to the allowance and payment of such Claim.  All of the aforementioned Claims objection and estimation procedures are cumulative and not exclusive of one another.

### G.    Claims Reserve

On any date that Distributions are to be made under the terms of the Combined Disclosure Statement and Plan, the GUC Trustee shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto. Such Cash or property, as the case may be, shall be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

### H.    Timing of Distributions

Unless otherwise provided herein, on each Distribution Date, each Holder of an Allowed Claim shall receive such Distributions that this Combined Disclosure Statement and Plan provide for Allowed Claims in accordance with Article VIII hereof. In the event that any payment or act under this Combined Disclosure Statement and Plan is required to be made or performed on a date that it not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. The GUC Trustee shall have no obligation to recognize any transfer of Claims or Equity Interests occurring on or after the Confirmation Date.

### I.    Delivery of Distributions

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (1) at the addresses set forth on the respective proofs of Claim Filed by such Holders; (2) at the addresses set forth in any written notices of address changes delivered to the GUC Trustee after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim is Filed and the GUC Trustee has not received a written notice of a change of address; provided, however, that Distributions in respect of DIP Facility Claims shall be made payable to the DIP Lenders for distribution in accordance with the DIP Credit Agreement and the DIP Financing Order.

If the Distribution to the Holder of any Claim is returned to the GUC Trustee as undeliverable, no further distribution shall be made to such Holder unless and until the GUC Trustee is notified in writing of such Holder's then current address. Undeliverable Distributions shall remain in the possession of the GUC Trustee until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution.

The GUC Trustee shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions; provided, however, nothing contained in the Combined Disclosure Statement and Plan shall require the GUC Trustee to locate any Holder of an Allowed Claim.

### J.      Unclaimed Distributions

Any Cash or other property to be distributed under the Combined Disclosure Statement and Plan shall revert to the GUC Trust if it is not claimed by the Entity on or before the Unclaimed Distribution Deadline. If such Cash or other property is not claimed on or before the Unclaimed Distribution Deadline, unless such deadline is extended in the sole discretion of the GUC Trustee, the Distribution made to such Entity shall be deemed to be reduced to zero.

### K.      *De Minimis* Distributions

The GUC Trustee shall not distribute Cash to the Holder of an Allowed Claim in an impaired Class if the amount of Cash to be distributed on account of such Claim is less than $50.00 in the aggregate. Any Holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than $50.00 in the aggregate will be forever barred from asserting its Claim for such distribution against the GUC Trustee or its property.  Any Cash not distributed under Articles VIII and X of the Combined Disclosure Statement and Plan will be the property of the GUC Trust.

### L.      Setoff and Recoupment

The Debtor or the GUC Trustee, as the case may be, retain the right, subject to any applicable notice provisions under applicable law, to reduce any Claim by way of setoff or recoupment in accordance with the Debtor's books and records.  Unless otherwise authorized by a Final Order, any Holder of a Claim, other than a holder of a Governmental Claim, must assert any setoff rights against a Claim by a Debtor against such Entity by Filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by a Debtor, Reorganized Debtor or GUC Trust, notwithstanding any statement to the contrary in a proof of claim or any other pleading or document Filed with the Bankruptcy Court or delivered to the Debtor.

### M.      Postpetition Interest

Interest shall not accrue on any prepetition Claims, and no Holder of a prepetition Claim shall be entitled to interest accruing on or after the Filing Date. No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of secured Claims under section 506(b) of the Bankruptcy Code.

### N.      Allocation of Distributions Between Principal and Interest

For Distributions in respect of Allowed General Unsecured Claims, to the extent that any such Allowed General Unsecured Claim entitled to a Distribution under the Combined Disclosure Statement and Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

O.      **No Penalty Claims.**

Subject to Section 507(a)(8)(G), and unless otherwise specifically provided for in this Combined Disclosure Statement and Plan or the Confirmation Order, no Holder of any Claim will be entitled to allowance of, or to receive any payment on account of, any penalty arising with respect to or in connection with such Claim and any such penalty shall be deemed disallowed and expunged.

P.      **No Creditor to Receive More than Payment in Full**

Notwithstanding any other provision hereof, no creditor shall receive more than full payment of its applicable Allowed Claim including any interest, costs or fees that may be payable with respect thereto under the Plan.

Q.      **Escheatment**

Notwithstanding any state escheatment law, any state that was required to File a Claim in its own right in connection with claims for property that had been deemed abandoned and had escheated to the state prepetition, but failed to comply with the Bar Date Order and File a proof of claim, will be forever barred from assertion of such Claim against the Debtor and its Estate unless otherwise ordered by the Bankruptcy Court.

R.      **Remaining Available Cash**

If in connection with closing the Chapter 11 Case, the cash remaining in the GUC Reserve is less than $25,000, the GUC Trustee in its sole discretion may donate such amount to a 501(c)(3) charity of its choice.

S.      **Compliance with Tax Requirements**

In connection with the Plan and all Distributions hereunder, to the extent applicable, the GUC Trustee is authorized to take any and all actions that may be necessary or appropriate to comply with all Tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements, as more fully set forth in Article XVI.I herein.  The GUC Trustee may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such Holder.  If the GUC Trustee makes such a request and the Holder fails to comply before the date that is 180 days after the request is made, unless such date is extended in the sole discretion of the GUC Trustee, the amount of such Distribution shall irrevocably revert to the GUC Trust and the right to a distribution on account of such Claim shall be forfeited.

## XI.    IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED DISCLOSURE STATEMENT AND PLAN

### A.    Means for Implementation of the Combined Disclosure Statement and Plan

In addition to the provisions set forth elsewhere in the Combined Disclosure Statement and Plan, the following shall constitute the means for implementation of the Combined Disclosure Statement and Plan:

### 1.    Funding of Liabilities and Distributions

Allowed Claims shall be paid from the GUC Trust, subject to the limitations and qualifications described herein, which shall be funded solely from the DIP Commitment.  For the avoidance of doubt, any funds remaining in the Administrative and Priority Reserve and the Professional Fee Reserve after payment in full of such claims shall be available to satisfy any Allowed Claims under this Combined Disclosure Statement and Plan.

### 2.    Corporate Action; Effectuating Documents; Further Transactions

On the Effective Date, all matters and actions provided for under the Combined Disclosure Statement and Plan that would otherwise require approval of the directors and officers, or members or managers of the Debtor shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the directors and officers, members and managers of the Reorganized Debtor. The Reorganized Debtor or the GUC Trustee, as applicable, is authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Disclosure Statement and Plan.

### 3.    Direction to Parties

From and after the Effective Date, the Reorganized Debtor or the GUC Trustee, as applicable, may apply to the Bankruptcy Court for an order directing any necessary party to execute or deliver or to join in the execution of delivery of any instruments required to effect a transfer of property contemplated by or necessary to effectuate this Plan, and to perform any other act that is necessary for the consummation of this Combined Disclosure Statement and Plan, pursuant to section 1142(b) of the Bankruptcy Code.

### 4.    Title to Accounts

Title to all of the Debtor's bank, brokerage, and other accounts shall vest in the Reorganized Debtor, effective as of the Effective Date, without any further order of the Bankruptcy Court or further action on the party of any Person or Entity. On and after the Effective Date, all such accounts shall be deemed to be accounts in the name of the Reorganized Debtor without any further action by any Person or Entity or any further order of the Bankruptcy Court.

### 5.    Exemption from Certain Taxes

As authorized by section 1146(a) of the Bankruptcy Code, any transfers of property under the Combined Plan and Disclosure Statement shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents related to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming and assigning any contract, lease or sublease; (3) any transaction authorize by this Combined Disclosure Statement and Plan; (4) any sale of an Asset by the GUC Trustee in furtherance of the Combined Disclosure Statement and Plan, including but not limited to any sale of personal or real property and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Combined Disclosure Statement and Plan.

### B.    Provisions Regarding Corporate Governance of the Reorganized Debtor

### 1.    Retention of Membership Interests in the Reorganized Debtor

On the Effective Date, JSI will continue to own 100% of all existing Equity Interests in the Debtor at the Direction of the DIP Lenders for the consideration provided to implement the Combined Plan and Disclosure Statement.

### 2.    Management of the Reorganized Debtor

On the Effective Date, the term of each member of the current board of managers of the Debtor shall expire, and the board of managers of the Reorganized Debtor, as well as the officers of the Reorganized Debtor, shall consist of those individuals that will be identified in the Plan Supplement. Following the Effective Date, the appointment and removal of the members of board of managers of the Reorganized Debtor shall be governed by the terms of the Reorganized Debtor's entity governance documents.

### 3.    Powers of Officers

The officers of the Debtor or the Reorganized Debtor, as applicable, shall have the power to (i) enter into, execute, or deliver any documents or agreements that may be necessary and appropriate to implement and effectuate the terms of the Combined Disclosure Statement and Plan, and (ii) take any and all other actions that may be necessary and appropriate to effectuate the terms of the Combined Disclosure Statement and Plan, including the making of appropriate filings, applications, or recordings, provided, however, that such documents and agreements are in form and substance acceptable to the DIP Lenders and Committee or the GUC Trustee, as applicable.

C. **Provisions Regarding Means of Implementation, Voting, Distributions, and Resolution of Disputed Claims**

1. **General Settlement of Claims**

Upon the Effective Date, and without modifying the confirmation requirements under Section 1129 of the Bankruptcy Code, the provisions of this Combined Disclosure Statement and Plan shall constitute a good faith compromise and settlement of all Claims, interests and controversies resolved under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases and other benefits provided under the Combined Disclosure Statement and Plan. Distributions made under the Combined Disclosure Statement and Plan to holders of Allowed Claims in any Class are intended to be final.

2. **Avoidance Actions**

On the Effective Date, all rights to commence, prosecute, or settle all Avoidance Actions, shall revest in the Reorganized Debtor. The Reorganized Debtor shall be deemed to have waived all such Avoidance Actions upon the Effective Date.

3. **Restructuring Transactions**

After the Effective Date, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by, or necessary to effectuate the terms of this Combined Disclosure Statement and Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms herein and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Combined Disclosure Statement and Plan and having other terms to which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion (including related formation) or dissolution under applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

4. **Approval and Authorization of Corporate and Company Action**

Under the Combined Disclosure Statement and Plan, upon the Effective Date, all corporate and limited liability company actions contemplated by the Combined Disclosure Statement and Plan shall be deemed authorized and approved in all respects, including (i) the transactions contemplated by Article XI of this Combined Plan and Disclosure Statement, (ii) the adoption and filing of appropriate certificates or articles of incorporation, formation, association, reincorporation, merger, consolidation, conversion, or dissolution, and memoranda and amendments thereto, under applicable law, (iii) the initial selection of managers, directors or officers for the Reorganized Debtor, (iv) the Distributions made under the Plan, and (v) all other actions contemplated by the Combined Disclosure Statement and Plan (whether to occur before,

on, or after the Effective Date), in each case unless otherwise provided in the Combined Disclosure Statement and Plan. All matters provided for under the Combined Disclosure Statement and Plan involving the entity structure of the Debtor and Reorganized Debtor or corporate and company action to be taken by or required of the Debtor or the Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such documents, and shall be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any requirement of further action by holders of Claims or Equity Interests, managers of the Debtor or the Reorganized Debtor, as applicable, or any other Person, except to effect the filing of any new entity governance documents respecting the Debtor, as necessary.

## 5.    Effectuating Documents; Further Transactions

After the Effective Date, the Reorganized Debtor, its managers, its officers, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Combined Disclosure Statement and Plan and the securities issued by effect of the Combined Disclosure Statement and Plan in the name of and on behalf of the Reorganized Debtor, without need for any approvals, authorization, or consents except for those expressly required by the Combined Disclosure Statement and Plan and applicable non-bankruptcy law.

## 6.    Reorganized Debtor Operating Agreement

After the Effective Date, the Reorganized Debtor may amend and restate its operating agreement as permitted by the laws of Delaware, and any related governance documents.

## 7.    Cancellation of Securities and Agreements

On the Effective Date, except as otherwise specifically provided for herein or in the Plan Supplement, (1) the obligations of the Debtor under any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtor that are specifically reinstated by the Combined Disclosure Statement and Plan), shall be cancelled solely as to the Debtor, and the Reorganized Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtor that are specifically reinstated by the Combined Disclosure Statement and Plan) shall be released and discharged; provided, however, notwithstanding confirmation of the Plan or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive Distributions under the Combined Disclosure Statement and Plan as provided herein.

8.    **Distributions in Respect of Allowed Claims**

Article X of this Combined Disclosure Statement and Plan sets forth the procedure for making distributions hereunder, which include provisions for the timing and manner of delivering distributions of claims, the treatment of unclaimed distributions, the treatment of interest on claims, the rights of the Debtor or Reorganized Debtor to effectuate setoffs against distribution and the certain tax and withholding information.

D.    <u>**Effect of Confirmation of the Plan**</u>

1.    **Continued Entity Existence**

Except as otherwise provided herein or in the Plan Supplement, including as provided with respect to Reorganized Debtor as set forth in Article XI.D.1 herein, or as may be provided in the Confirmation Order, the Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a limited liability company, with all the powers thereof, under the law of the State of Delaware and any entity organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended by the Combined Disclosure Statement and Plan and to the extent such documents are amended, such documents are deemed to be amended by the Combined Disclosure Statement and Plan and require no further action or approval. For the avoidance of doubt, JSI shall continue to own 100% of the Equity Interests in the Reorganized Debtor after the Effective Date.

2.    **Vesting of Assets**

Except as otherwise set forth in this Combined Disclosure Statement and Plan, the Plan Supplement, or any other agreement, instrument, or other document incorporated herein, on the Effective Date all property of the Estate, all Causes of Action, and any other property acquired by the Debtor under the Combined Disclosure Statement and Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for any Liens applicable to any capitalized leases existing on the Effective Date), except as is otherwise indicated herein. On and after the Effective Date, except as otherwise provided herein, the Reorganized Debtor may operate its business and conduct its affairs, and may use, acquire, or dispose of its property and assets and compromise or settle any Claims, interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

3.    **Preservation of Causes of Action**

Subject to the releases and exculpations set forth herein at Article XII, the First Interim DIP Order, the Second Interim DIP Order, the Final DIP Order, and the DIP Credit Agreement, in accordance with section 1123(b)(3) of the Bankruptcy Code, under the Combined Disclosure Statement and Plan, the Reorganized Debtor shall acquire all Causes of Action and nothing contained in the Combined Disclosure Statement and Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Causes of Action; <u>provided</u>, <u>however</u>, that, upon the Effective Date the Reorganized Debtor shall be deemed to have waived all Avoidance Actions.

### 4.    Discharge of the Debtor

Under section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Combined Disclosure Statement and Plan, the Plan Supplement, or the Confirmation Order, the Distributions and rights that are provided hereunder shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of any and all Claims and Causes of Action (whether known or unknown) against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtor and Reorganized Debtor or any of its assets or properties, regardless of whether any property or assets shall have been distributed or retained under this Combined Plan  and Disclosure Statement on account of such Claims, rights, and interests, including Claims and interests that arose before the Effective Date, any liability (including withdrawal liability to the extent such Claims relate to services performed by employees of the Debtor prior to the Filing Date and that arise from a termination of employment or a termination of any employee or retiree benefit program which occurred prior to the Effective Date), and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or interest was Filed, is Filed, or deemed Filed under section 501 of the Bankruptcy Code, (b) a Claim or interests based upon such Claim, debt, right, or interest is Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or interest accepted the Combined Disclosure Statement and Plan. As provided in the Combined Disclosure Statement and Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims against and interests in the Debtor, subject to the terms thereof and the occurrence of the Effective Date.

## XII.    EXCULPATION, RELEASES AND INJUNCTIONS

### A.    Exculpation

**The Exculpated Parties shall not have or incur, and are hereby released from, any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability to one another or to any Holder of any Claim or Equity Interest, or any other party-in-interest, or any of their respective Related Parties, for any act or omission originating or occurring on or after the Filing Date through and including the Effective Date in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the negotiation and Filing of this Combined Disclosure Statement and Plan, (iii) the Filing of the Chapter 11 Case, (iv) the prosecution or settlement of Claims and Causes of Action, (v) the performance, assumption, assignment, termination, or rejection of Executory Contracts, (vi) the pursuit of confirmation of this Combined Disclosure Statement and Plan, (vii) the consummation of this Combined Disclosure Statement and Plan, (viii) the administration of this Combined Disclosure Statement and Plan or (ix) the distribution of property to be Distributed under this Combined Disclosure Statement and Plan, except for (a) any Claims and Causes of Action for actual fraud, willful misconduct or gross negligence as determined by Final Order of a court of competent jurisdiction and (b) any obligations that they have under or in connection with this Combined Disclosure Statement and Plan or the transactions contemplated in this Combined Disclosure Statement and Plan.  Nothing herein shall prevent any Exculpated Party from asserting as a defense to any claim of actual fraud, willful misconduct or gross negligence that they reasonably**

relied upon the advice of counsel with respect to their duties and responsibilities under the Combined Disclosure Statement and Plan or otherwise.

**B.    Releases by the Debtor**

Except for any Claims and Causes of Action for actual fraud or willful misconduct as determined by Final Order of a court of competent jurisdiction, effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, its Estate and any Person or Entity seeking to exercise the rights of the Debtor's Estate, including, without limitation, each of the Debtor's successors and assigns, shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, void and extinguish the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability, for any act or omission in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the negotiation and Filing of this Combined Disclosure Statement and Plan, (iii) the Filing of the Chapter 11 Case, (iv) the prosecution or settlement of Claims and Causes of Action, (v) the performance, assumption, assignment, termination, or rejection of Executory Contracts, (vi) the pursuit of confirmation of this Combined Disclosure Statement and Plan, (vii) the consummation of this Combined Disclosure Statement and Plan, (viii) the administration of this Combined Disclosure Statement and Plan or (ix) the distribution of property to be Distributed under this Combined Disclosure Statement and Plan.

**C.    Third Party Releases**

Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, void and extinguish the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability, for any act or omission that took place prior to the Filing Date relating to and/or in connection with the Debtor or in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the negotiation and Filing of this Combined Disclosure Statement and Plan, (iii) the Filing of the Chapter 11 Case, (iv) the prosecution or settlement of Claims and Causes of Action, (v) the performance, assumption, assignment, termination, or rejection of Executory Contracts, (vi) the pursuit of confirmation of this Combined Disclosure Statement and Plan, (vii) the consummation of this Combined Disclosure Statement and Plan, (viii) the administration of this Combined Disclosure Statement and Plan or (ix) the distribution of property to be Distributed under this Combined Disclosure Statement and Plan.

**D.    Injunctions Relating to Releases**

Except as expressly otherwise provided in the Combined Disclosure Statement and Plan or in an Order of the Bankruptcy Court, effective as of the Effective Date, all Persons that hold, have held or may hold a claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability of any nature whatsoever, that is

released pursuant to this Combined Disclosure Statement and Plan, shall be permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such released claims, Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum, (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order, (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien, (iv) setting off (except to the extent such setoff was exercised prior to the Filing Date), seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Person released under this Combined Disclosure Statement and Plan, and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Combined Disclosure Statement and Plan or the Confirmation Order.

E.    **Injunctions to Protect Estate Assets**

Except as expressly otherwise provided in the Combined Disclosure Statement and Plan, including Article XVI.B hereof, or to the extent necessary to enforce the terms and conditions of the Combined Disclosure Statement and Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Entities who have held, hold or may hold Claims against or Equity Interests in the Debtor shall be permanently enjoined from taking any of the following actions against the Debtor, the Debtor's Estate, the Reorganized Debtor, the GUC Trustee or any of their property on account of any such Claims or Equity Interests:  (i) commencing or continuing, in any manner or in any place, any action, Cause of Action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or Order; (iii) creating, perfecting, or enforcing any Lien; (iv)  asserting a setoff (except to the extent such setoff was exercised prior to the Filing Date),  right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing, in any manner or in any place, any action, Cause of Action or other proceeding that does not comply with or is inconsistent with the provisions of the Combined Disclosure Statement and Plan.

## XIII.  EXECUTORY CONTRACTS

A.    **Executory Contracts**

1.    **Assumption and Rejection of Executory Contracts**

Except as otherwise provided herein, as of the Effective Date, all Executory Contracts governed by section 365 of the Bankruptcy Code to which the Debtor is party are thereby

rejected except for any Executory Contract that (i) previously has been assumed or rejected by the Debtor in the Chapter 11 Case, (ii) previously expired or terminated by its own terms, or (iii) is the subject of a separate motion to assume or reject such Executory Contract Filed by the Debtor under section 365 of the Bankruptcy Code prior to the Effective Date.

### 2.      Rejection Damage Claims and Rejection Bar Date

Any and all Claims for damages arising from the rejection of an Executory Contract must be Filed with the Court in accordance with the terms of the Final Order authorizing such rejection or the Bar Date Order, but in no event later than thirty (30) days after the Effective Date to the extent an earlier time has not been established by the Court. Any Claim for damages arising from the rejection of an Executory Contract by effect of an order entered prior to the Rejection Bar Date will be governed by the order authorizing such rejection and will not be extended by this Combined Disclosure Statement and Plan or the Confirmation Order. Any Claims for damages arising from the rejection of an Executory Contract that is not Filed within such time period will be forever barred from assertion against the Debtor, its Estate and the Reorganized Debtor.  Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts shall be treated as General Unsecured Claims under the Combined Disclosure Statement and Plan.

### 3.      Restrictions on Assignment Void

Any Executory Contract assumed or assumed and assigned shall remain in full force and effect to the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such Executory Contract (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment, including based on any change of control provision.  Any provision that prohibits, restricts, or conditions the assignment or transfer of any such Executory Contract, terminates or modifies such Executory Contract or allows the counterparty to such Executory Contract to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition thereof (including on account of any change of control provision) on any such transfer or assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

No sections or provisions of any Executory Contract that purport to provide for additional payments, penalties, charges, rent acceleration, or other financial accommodations in favor of the non-debtor third party thereto shall have any force and effect with respect to the transactions contemplated hereunder, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code.

### 4.      Benefit Plans

As of and subject to the Effective Date, all employment agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtor applicable generally to its employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including all savings plans, retirement

plans, health care plans, disability plans, incentive plans, and life, accidental death, and dismemberment insurance plans, and senior executive retirement plans, but expressly excluding any nonqualified deferred compensation plans that are treated as unfunded for tax purposes and Title 1 of ERISA, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed hereunder, with a cure amount of zero dollars (as any amounts owed under the respective programs are the obligation of the applicable non-Debtor Affiliate), and the Debtor's obligations under all such agreements and programs shall survive the Effective Date of this Combined Disclosure Statement and Plan, without prejudice to the Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements in accordance with the terms and provisions thereof, except for (i) such executory contracts or plans specifically rejected by Combined Disclosure Statement and Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code), and (ii) such executory contracts or plans as have previously been terminated, or rejected, by a Final Order, or specifically waived by the beneficiaries of such plans, benefits, contracts, or programs.

### 5.    Workers' Compensation and Insurance Programs

All (i) applicable workers' compensation laws in states in which the Reorganized Debtor operates and (ii) of the Debtor's written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs and plans regarding or relating to workers' compensation, workers' compensation insurance, and all other forms of insurance, unless specified in the Plan Supplement, are treated as Executory Contracts under this Combined Disclosure Statement and Plan and on the Effective Date will be assumed as authorized by sections 365 and 1123 of the Bankruptcy Code, with a cure amount of zero dollars.

### B.    <u>Debtor's Insurance Policies</u>

Nothing in the Combined Disclosure Statement and Plan alters the rights and obligations of the Debtor (and its Estate) and the Debtor's insurers (and third-party claims administrators) under the Debtor's insurance policies or modifies the coverage or benefits provided thereunder or the terms or conditions thereof or diminishes or impairs the enforceability of the Debtor's insurance policies.

## XIV.    CONDITIONS TO CONFIRMATION AND THE EFFECTIVE DATE

### A.    <u>Conditions Precedent to Confirmation</u>

The following are conditions precedent to Confirmation that must be satisfied or waived:

1.    The Confirmation Order shall be reasonably acceptable in form and substance to the Debtor, the DIP Lenders and the Committee; and

2.    Any exhibits or schedules incorporated as part of the Combined Plan and Disclosure Statement shall be reasonably acceptable in form and substance to the Debtor, the DIP Lenders and the Committee.

B.    **Conditions Precedent to the Effective Date**

The Combined Disclosure Statement and Plan shall not become effective unless and until the following conditions shall have been satisfied or waived:

    1.    Entry of the Confirmation Order

    2.    The Confirmation Order shall have become a Final Order.

    3.    The GUC Trustee shall be duly appointed, qualified and acting in that capacity.

C.    **Establishing the Effective Date**

The calendar date to serve as the Effective Date shall be a Business Day of, on or promptly following the satisfaction or waiver of all conditions to the Effective Date, which date will be selected by the Debtor, after reasonable consultation with the DIP Lenders and the Committee.  On or within one (1) Business Days of the Effective Date, the Debtor shall File and serve a notice of occurrence of the Effective Date. Such notice shall contain, among other things, (i) the Administrative Expense Bar Date, (ii) the deadline by which Professionals must File and serve any Professional Claims, (iii) the deadline to File a proof of claim relating to damages from the rejection of any Executory Contract by the terms of this Combined Disclosure Statement and Plan, and (iv) contact information so that Suite Key Claimants may contact Delux regarding their designation rights and transfer of Credits.

D.    **Effect of Failure of Conditions**

If each condition to the Effective Date has not been satisfied or duly waived within forty-five (45) days after the Confirmation Date, then upon motion by any party in interest, made before the time that each of the conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Debtor before any Order granting such relief becomes a Final Order. If the Confirmation Order is vacated by effect of this section, the Combined Disclosure Statement and Plan shall be deemed null and void in all respects and nothing contained herein shall (A) constitute a waiver or release of any Claims by or against the Debtor, or (B) prejudice in any manner the rights of the Debtor.

E.    **Waiver of Conditions to Confirmation and Effective Date**

Each of the conditions to the Effective Date may be waived, in whole or in part, by the Debtor, without notice or an Order of the Bankruptcy Court.

## XV.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, following the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case as is legally permissible, including, without limitation, such jurisdiction as is

necessary to ensure that the interests and purposes of the Combined Disclosure Statement and Plan are carried out. The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Combined Disclosure Statement and Plan for, among other things, the following purposes:

     1.    To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

     2.    To hear and determine pending applications for the assumption or rejection of Executory Contracts, if any are pending, and the allowance of any Claims resulting therefrom;

     3.    To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

     4.    To issue such Orders in aid of execution and consummation of the Combined Disclosure Statement and Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

     5.    To consider any amendments to or modifications of the Combined Disclosure Statement and Plan, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

     6.    To hear and determine all requests for compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code;

     7.    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Combined Disclosure Statement and Plan;

     8.    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtor, the Reorganized Debtor, or the GUC Trustee for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

     9.    To hear any other matter not inconsistent with the Bankruptcy Code;

     10.    To enter a final decree closing the Chapter 11 Case;

     11.    To ensure that Distributions to Holders of Allowed Claims are accomplished as provided by the provisions of the Combined Disclosure Statement and Plan;

     12.    To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

     13.    To issue such Orders as may be necessary or appropriate to expand or otherwise modify the powers and duties of the GUC Trustee;

14.    To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Combined Disclosure Statement and Plan, except as otherwise provided herein;

15.    To determine any other matters that may arise in connection with or related to the Combined Disclosure Statement and Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Combined Disclosure Statement and Plan or the Disclosure Statement;

16.    To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

17.    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

18.    To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the General Bar Date, the Governmental Unit Bar Date, the Rejection Bar Date, the Administrative Expense Bar Date, and/or the conditional or final hearing on the approval of the Combined Disclosure Statement and Plan for the purpose of determining whether a Claim, or Equity Interest is released, satisfied and/or enjoined hereunder or for any other purpose; and

19.    To resolve any other matter or for any purpose specified in the Combined Disclosure Statement and Plan, the Confirmation Order, or any other document entered into in connection with any of the foregoing.

## XVI.    <u>MISCELLANEOUS PROVISIONS</u>

### A.    <u>Books and Records</u>

The Reorganized Debtor and its professionals shall use commercially reasonable efforts to cooperate with the GUC Trust and GUC Trustee and professionals engaged by the GUC Trustee in attempting to identify and facilitate access to any evidence and information the GUC Trustee reasonably requests (including but not limited to reasonable access to the Debtor's books and records) in connection with the GUC Trustee's objections to Disputed General Unsecured Claims, with all such obligations limited as set forth in the GUC Trust Agreement.

### B.    <u>Termination of Injunctions or Stays</u>

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect to the extent provided in Section 362(c).

C.      **Amendment or Modification of the Combined Disclosure Statement and Plan**

Alterations, amendments or modifications of the Combined Disclosure Statement and Plan may be proposed in writing by the Debtor, at any time before the Confirmation Date, provided that the Combined Disclosure Statement and Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code. Additionally, after the Confirmation Date, the Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein. No amendments or modifications that adversely affect the Class 4 and Class 5 Holders shall be made without the consent of the Committee, in each case which consent shall not be unreasonably withheld, conditioned or delayed.

D.      **Severability**

In the event the Bankruptcy Court determines, before the Confirmation Date, that any provision in the Combined Disclosure Statement and Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the Holder or Holders of such Claims or Equity Interest as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidability or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Combined Disclosure Statement and Plan.

E.      **Revocation or Withdrawal of the Combined Disclosure Statement and Plan**

The Debtor reserves the right to revoke or withdraw the Combined Disclosure Statement and Plan before the Confirmation Date. If the Debtor revokes or withdraws the Combined Disclosure Statement and Plan before the Confirmation Date, then the Combined Disclosure Statement and Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or GUC Trustee or to prejudice in any manner the rights of either of the Debtor or GUC Trustee in any further proceedings involving the Debtor.

F.      **Binding Effect**

Subject to the occurrence of the Effective Date, the Combined Disclosure Statement and Plan shall be binding upon and inure to the benefit of the Debtor, the Holders of Claims, and the Holders of Equity Interests, and their respective successors and assigns.

G.      **Notices**

All notices, requests and demands to or upon the GUC Trustee or the Debtor, as applicable, to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as shall be set forth in the notice of the Effective Date.

**H.**     <u>**Governing Law**</u>

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to the Combined Disclosure Statement and Plan provides otherwise, the rights and obligations arising under the Combined Disclosure Statement and Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

**I.**     <u>**Withholding and Reporting Requirements**</u>

In connection with the consummation of the Combined Disclosure Statement and Plan, the Debtor and GUC Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Combined Disclosure Statement and Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution. The Debtor and the GUC Trustee have the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to any disbursing party for payment of any such tax obligations. The Debtor or GUC Trustee may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim complete and return a Form W-8, W-9 or a similar tax form, as applicable to each such Holder. If the Debtor or GUC Trustee make such a request and the Holder fails to comply before the date that is 90 days after the request is made, unless such date is extended in the sole discretion of the GUC Trustee, such Holder shall be deemed to have forfeited rights to all Distributions and the amount of such forfeited Distributions shall irrevocably revert to the Debtor and any Claim in respect of such Distribution shall be disallowed and forever barred from assertion against the Debtor or its property.

**J.**     <u>**2002 Service List**</u>

After the Effective Date, any Entities or Persons that want to continue to receive notice in these Chapter 11 Cases must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002 no later than thirty (30) days after the Effective Date of the Combined Plan and Disclosure Statement; <u>provided</u>, <u>however</u>; that the United States Trustee shall be excused from this requirement and shall remain on the Bankruptcy Rule 2002 service list. To the extent a renewed request is not timely Filed with the Bankruptcy Court, the GUC Trustee or the Reorganized Debtor, as applicable, are authorized to limit notice and not include such Entities or Persons on any post-Effective Date Bankruptcy Rule 2002 service list. For the avoidance of doubt, all post-Effective Date notices and pleadings will be served on all Entities or Persons whose rights are affected by such notices or pleadings, regardless of whether the affected Entity or Person has elected to remain on any post-Effective Date Bankruptcy Rule 2002 service list.

**K.**    **Headings**

Headings are used in the Combined Disclosure Statement and Plan for convenience and reference only, and shall not constitute a part of the Combined Disclosure Statement and Plan for any other purpose.

**L.**    **Exhibits/Schedules**

All exhibits and schedules to the Combined Disclosure Statement and Plan, including the Plan Supplement, are incorporated into and are a part of the Combined Disclosure Statement and Plan as if set forth in full herein.

**M.**    **Filing of Additional Documents**

On or before substantial consummation of the Combined Disclosure Statement and Plan, the Debtor shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Disclosure Statement and Plan.

**N.**    **No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Combined Disclosure Statement and Plan shall be deemed as an admission by any Entity with respect to any matter set forth herein.

**O.**    **Successors and Assigns**

The rights, benefits and obligations of any Person or Entity named or referred to in the Combined Disclosure Statement and Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

**P.**    **Reservation of Rights**

Except as expressly set forth herein, the Combined Disclosure Statement and Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Combined Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Debtor with respect to the Combined Disclosure Statement and Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor, Holders of Claims or Equity Interest before the Effective Date.

**Q.**    **Implementation**

The Debtor shall take all steps, and execute all documents, including appropriate releases, necessary to effectuate the provisions contained in this Combined Disclosure Statement and Plan.

R.    **Inconsistency**

In the event of any inconsistency among the Combined Disclosure Statement and Plan and any other instrument or document created or executed under the Combined Disclosure Statement and Plan, the provisions of the Combined Disclosure Statement and Plan shall govern.

S.    **Dissolution of the Committee**

Upon the occurrence of the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals and agents shall be released from any duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code (except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) applications for allowance and payment of Professional Claims, and (iii) any pending motions or motions for other actions seeking enforcement of implementation of the provisions of the Combined Disclosure Statement and Plan).

T.    **Termination of the GUC Trustee**

After the Chapter 11 Case is closed and the GUC Trustee has completed all of the tasks necessary in order to fully and completely comply with its obligations under the terms of the Combined Disclosure Statement and Plan and the GUC Trust Agreement, the GUC Trustee shall have fully completed its duties and thereby shall be fully released and discharged of its duties and obligations to carry out the terms of the Combined Disclosure Statement and Plan and the GUC Trust Agreement.

U.    **Compromise of Controversies**

Pursuant to Sections 363 and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and without waiving the confirmation requirements of Section 1129 of the Bankruptcy Code, and in consideration for the classification, Distribution and other benefits provided under the Combined Disclosure Statement and Plan, the provisions of this Combined Disclosure Statement and Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved by the Combined Disclosure Statement and Plan and in the Chapter 11 Case. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Combined Disclosure Statement and Plan and the Chapter 11 Case, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements show entire fairness and are in the best interests of the Debtor, the Estate and all Holders of Claims and Equity Interests against the Debtor.

**V.**        **Request for Expedited Determination of Taxes**

The Debtor, the Reorganized Debtor, and the GUC Trustee shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Filing Date through the Effective Date.


Dated: July 20, 2020                    SUPERIOR AIR CHARTER, LLC
Wilmington, Delaware

                                By:   */s/ Edward T. Gavin*
                                Name: Edward T. Gavin, CTP
                                Title: Chief Restructuring Officer