## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | Case No. 20-11007 (CSS) |
| SUPERIOR AIR CHARTER, LLC | ) | |
| | ) | Jointly Administered |
| Reorganized Debtor. | ) | |
| _____ | ) | Docket No.: 263 |

## OPINION[1]

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
David B. Stratton
Evelyn J. Meltzer
Marcy J. McLaughlin Smith
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington DE  19899-1709

Counsel to the GUC Trustee

Jack Walton
Walton Technical Consulting, Inc.
625 Aviator Drive
Fort Worth, TX76179
Pro se

Kevin J. Kinsella
1134 Kline Street
La Jolla, CA  92037
Pro se

**AERLEX TAX SERVICES**
Vicky Boladian
11900 W. Olympic Blvd
Suite 400
Los Angeles, CA  90064

Counsel for Aerlex Tax Services

**SULLIVAN HAZELTINE ALLINSON LLC**
William D. Sullivan
919 North Market Street, Suite 420
Wilmington, DE  19801

Attorneys for Richard Brown and
 Julius Glickman

Date: April 9, 2021

Sontchi, C.J._____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 9014(c) and 7052.

**INTRODUCTION**[2]

JetSuite was an air service provider that generated income by promising to provide consumers air services at locked-in hourly flight rates in exchange for consumers' prepayments of money.[3] JetSuite filed for bankruptcy protection after meeting financial difficulties due to competition as well as the reduced demand caused by COVID-19.[4]

Consumers, *inter alia*, filed claims for the prepayments they made. The GUC Trustee filed an Objection to some of the claims.[5] Left before the Court are three matters: (i) the disposition of the GUC Trustee's Objection to the roughly fifty 507 Claims, (ii) the disposition of the GUC Trustee's Objection to the FET Claims, and (iii) the disposition of the GUC Trustee's Objection to the Accounting Claims.

For the reasons that follow, the Court grant, in part, and deny, in part, the Objection.

**JURISDICTION & VENUE**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has the judicial power to enter a final order.

---

[2] Capitalized terms used in this section are later defined.

[3] D.I. 8 at p. 2–3 ¶¶6-8.

[4] *See, e.g.*, *id.*

[5] The GUC Trustee brought the Objection pursuant to Section 502(b) of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 3003 and 3007, and Local Rule 3007-1.

## BACKGROUND & PROCEDURAL HISTORY

Superior Air Charter, LLC ("JetSuite" or "Reorganized Debtor") was an air service provider that filed for bankruptcy protection after meeting financial difficulties due to competition as well as the reduced demand caused by COVID-19.[6] JetSuite generated income by providing and entering into boilerplate agreements[7] with consumers to provide to them future air services at locked-in hourly flight rates in exchange for large prepayments of money.[8]

Most consumers were given the choice of prepaying $107,500, $268,750.00, or $537,500.00.[9] Larger payments were accompanied by a decrease in the contracted flight hour price.[10] While JetSuite did not hold these payments in trust, they were refundable if it unilaterally terminated the agreement.[11]

---

[6] D.I. 8 at p. 2–3 ¶¶6-8.

[7] Overtime, JetSuite presented three substantially similar versions of the agreement to consumers: SuiteKey Agreement 1.0 ("Agreement 1.0"), SuiteKey Agreement 2.0 ("Agreement 2.0") and SuiteKey Agreement 3.0 ("Agreement 3.0" together with Agreements 1.0 and 2.0 the "Agreement"). *See, e.g.*, D.I. 307 at p.12 ¶12. Two differences are worth noting. First, Agreement 1.0 provides a lower payment range than Agreements 2.0 and 3.0. *Compare* Agreement 1.0, p. 1 (offering payment options of $53,750.00, $107,500.00, $215,000.00, and $430,000.00) *with* Agreements 2.0 and 3.0 (offering payment options of $107,500, $268,750.00, and $537,500.00) p. 1. Second, Agreement 1.0 does not impose a time limit within which consumers must use or lose the amount of their account balance. *Compare* Agreement 1.0, *Terms and Conditions* (2)(b) *with* Agreements 2.0 and 3.0 *Terms and Conditions* (2)(b). Approximately forty percent of the customers entered into Agreement 1.0 with the remaining customers entering into Agreements 2.0 and 3.0. *See e.g.*, D.I. 307 p. 12 ¶15.

[8] *See e.g.*, D.I. 307 p. 12 ¶15.

[9] *See, supra* note 7.

[10] D.I. 8 at p.5 ¶13.

[11] *Compare* Agreements 1.0, 2.0 and 3.0, *Terms and Conditions* (2)(a) ("Member's funds shall be treated as a fully and irrevocably pre-paid purchase of services and payment of expenses hereunder and such payment shall be irrevocable and non-refundable in all circumstances.") *with id.* at (22) ("JetSuite Air may terminate Member's participation in the Program . . . . JetSuite Air will provide a refund of any remaining balance to the Member after deduction of any amounts due.") and Agreement 1.0, *Terms and Conditions* (14) ("[I]n the

After paying one of the prepayment options and signing the Agreement, consumers became entitled to future air services at the locked-in contract prices.[12] The terms of the Agreement further required JetSuite to create an account in the name of each consumer and maintain a notional account balance in said account.[13] This notional balance was not an actual reflection of cash but rather a non-cash representation of the total prepayment consumers made.[14] As consumers traveled, JetSuite was obligated to adjust the consumers' notional balance to reflect consumers' initial payments less the locked-in contract value of air services and related charges JetSuite actually provided.[15]

Consumers' notional account balances were not marketable, transferable, or assignable.[16] And, in most cases, the prepayment amounts were required to be used in their entirety within twenty four months or the unused portions were forfeit to JetSuite.[17] As there were more consumers than available aircraft, consumers were required to make flight reservations at least forty-eight hours prior to departure to guarantee availability.[18]

---

case of Termination initiated by JetSuite Air, a refund of any remaining balance to client after deduction of any amounts due.").

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] Agreement 3.0, *Terms and Conditions* (32) ("Member shall not re-market, transfer, assign, or otherwise re-sell any services provided by JetSuite Air . . . ."); Agreement 2.0, *Terms and Conditions* (32) (same); Agreement 1.0 *Terms and Conditions* (24) (same).

[17] Agreements 2.0 and 3.0, *Terms and Conditions* (2) ("The Initial [sic] Deposit and any subsequent Deposits ('Deposits') are non-refundable and are available for use by Member for the initial 24 months after the Start Date. After the intial [sic] 24 months of this Agreement, any unused Deposits will be retained by JetSuite Air and no longer available to Member . . . ."). But see Agreement 1.0 (lacking any time constraints).

[18] *See e.g.,* D.I. 8 at p. 4 ¶11 and p. 2 ¶6 (Debtor operated twelve aircraft prior to filing). Agreements 2.0 and 3.0, *Terms and Conditions* (4) ("Members must reserve a Flight Segment originating and terminating inside of the contiguous U.S. at least 48 hours prior to departure in order to guarantee availability.").

On April 20, 2020, JetSuite commenced its reorganization by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").[19]   On July 20, 2020, JetSuite filed its *Amended Chapter 11 Combined Plan & Disclosure Statement* (the "Plan").[20]   On September 4, 2020, the Court confirmed the Plan which became effective on September 18, 2020.[21]   The Court's confirmation order also approved Gavin/Solmonese, LLC as the GUC Trustee.[22]

On June 24, 2020, the Court entered an order establishing July 27, 2020, as the general claims bar date.[23]   On February 11, 2021, the Court extended the claim objection deadline from March 17, 2021 to December 31, 2021.[24]   On November 13, 2020, the GUC Trustee filed its Second Omnibus Objection to Claims (the "Objection").[25]   The Objection seeks to disallow, in whole or in part, three categories of claims.[26]   First, certain no liability claims attached to Exhibit A.[27]   Second, certain misclassified claims (the "507 Claims") attached to Exhibit B.[28]   Third, certain overstated claims attached to Exhibit C.[29]

---

[19] D.I. 1.

[20] D.I. 168.

[21] D.I. 212 (order confirming the plan); D.I. 226 (notice of effective date).

[22] *Id.* at p. 18 ¶12.

[23] D.I. 125 and D.I. 131.

[24] D.I. 318.

[25] D.I. 162 (First Omnibus Objection to Claims); D.I. 263 (Second Omnibus Objection to Claims).

[26] D.I. 263 at p. 1.

[27] *Id.* at p. 4 ¶13.

[28] *Id.* at ¶15.

[29] *Id.* at p. 5 ¶17.

The GUC Trustee resolved three of the five responses it received to its Objection.[30] The first unresolved response was filed on November 30, 2020, by claimants Richard Brown and Julius Glickman and amended on December 1, 2020.[31]  The second unresolved response was filed by claimant Kevin Kinsella on December 2, 2020.[32] After a December 17, 2020 hearing, the Court entered an order granting the Objection for the Exhibit A, no liability claims, and adjourning the 507 Claims and claims 89, 105, 118, 119, 156, 245, 285, 290,[33] 296, 298, and 314 (together with the 507 Claims the "Adjourned Claims") for disposition after further briefing and a hearing.[34]  On January 15, 2021, the GUC Trustee filed its Reply supporting its Objection.[35]  In its Reply, the GUC Trustee withdrew its objections to claims 89, 118, 298, 314, 285, and 296.[36]  Finally, on January 21, 2021, the Court held a hearing on the disposition of the Adjourned Claims.[37]

Left before the Court are three matters:  (i) the disposition of the GUC Trustee's Objection to the roughly fifty claimants who filed 507 Claims,[38]  (ii) the disposition of the GUC Trustee's Objection to the federal excise tax portion of claims 119, 156, and 245 (the

---

[30] *See* D.I.s 269−273;  D.I. 289 p. 1-2 at ¶3. The GUC Trustee withdraws its objections to the claims 298 and 118 of Aerlex Tax Services, LLC and Phillips 66 Company respectively. D.I. 289 p. 1-2 at ¶3. The GUC Trustee represented under certificate of counsel that it contacted Walton Technical Consulting, Inc., and Walton Technical Consulting, Inc. does not oppose the relief sought in the GUC Trustee's Objection. *Id.*

[31] D.I. 269 and D.I. 271 (507 Response).

[32] D.I. 272.

[33] D.I. 290 p. 2 ¶4. The order incorrectly states claim "90" instead of claim "290."

[34] D.I. 290.

[35] D.I. 307.

[36] *See id.* at p. 4–9.

[37] D.I. 314.

[38] D.I. 263 at Exhibit B; *See* D.I. 290 at p. 2 ¶3.

"FET Claims"), and (iii) the disposition of the GUC Trustee's Objection to the portions of claims 105, 119, and 290 that arise from accounting discrepancies (the "Accounting Claims") between Reorganized Debtor and claimants. Facts specific to these matters are set forth below.

## ANALYSIS

### A.  Claims Objection and Burden of Proof

Section 502(b) of the Bankruptcy Code states that the Court shall allow a claim, except to the extent "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured. . . ."[39] The filing of a proof of claim constitutes *prima facie* evidence of the validity of the claim.[40] Once established, the objector then has the burden "to produce evidence sufficient to negate the prima facie validity of the filed claim."[41]

### B.  The 507 Claims

The parties disagree as to whether the prepayments that consumers made to JetSuite should be considered deposits under 11 U.S.C. section 507(a)(7). The consumer claimants argue that that they payments they made for unreceived flight services were deposits under the consumer priority statute and should be granted 507(a)(7) priority.[42]

---

[39]  11 U.S.C.A. § 502(1).

[40] *See* 11 U.S.C. § 502(a).

[41] *Id.*

[42] D.I. 272 ("[T]here should be no dispute that [Claimant's] payments to JetSuite represent a deposit of money paid in advance for flight services which JetSuite promised to deliver.")

Conversely, the GUC Trustee argues that the consumer claimants' payments were not deposits because they were (i) nonrefundable or (ii) were payments, not for future air services, but for membership, a notional account balance, or both and as such, do not qualify for § 507(a)(7) priority treatment.[43]

The issue before the court is whether the prepurchase payments the claimants made to JetSuite qualify for section 507(a)(7) priority.

### 1. § 507(a)(7) Is Unambiguous

In interpreting the terms of a statute, courts "start, of course, with the statutory text, and proceed from that understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning."[44] Ordinary meaning, is ascertained by referring to standard dictionaries.[45]

If, after interpretation, the Court determines that a statute's meaning is unambiguous, "no construction is permissible."[46]  As such, the general rule of statutory construction that bankruptcy priorities "are to be narrowly construed"[47] "should not apply absent statutory ambiguity."[48]  But even where ambiguity exists, the maxim of

---

[43] D.I. 307 at p. 10.

[44] *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013).

[45] *Pennsylvania, Dep't of Pub. Welfare v. U.S. Dep't of Health & Hum. Servs.*, 647 F.3d 506, 511 (3d Cir. 2011) (omitting internal quotation marks and citations) (quoting *United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008)).

[46] *Marmon v. R.R. Ret. Bd.*, 218 F.2d 716, 718 (3d Cir. 1955).

[47] *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667–68 (2006) (citing 2 Collier Bankruptcy Manual ¶ 507.01, p. 507-4 (rev.3d ed.2005) ("[P]riorities under the Code are to be narrowly construed.")); 4 Collier on Bankruptcy P 507.01 (16th 2020) ("Because priorities grant special rights to the holders of priority claims, priorities under the Code are to be narrowly construed.").

[48] 3 Sutherland Statutory Construction § 58:1 (8th ed.).

strict or narrow construction of bankruptcy priorities may not perversely narrow, limit, or restrict the intent of the legislature found in the ordinary and natural meaning of the words they employ.[49]

11 U.S.C. § 507(a)(7) provides consumer priority protection as follows:

> **(a)** The following expenses and claims have priority in the following order:
>
> **(7)** Seventh, allowed unsecured claims of individuals, to the extent of $3,025[50] for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

As the legislature chose not to define the term deposit, the Court turns to standard references to confirm the ordinary meaning of the statute.  Deposit, *inter alia*, means:

> **1.** The act of giving money or other property to another who promises to preserve it or to use it and return it in kind; esp., the act of placing money in a bank for safety and convenience. — Also termed (when made at a bank) *bank deposit.*
> **2.** The money or property so given.
> **3.** Money placed with a person as earnest money or security for the performance of a contract. • The money will be forfeited if the depositor fails to perform. — Also termed *security deposit.*[51]

---

[49] *United States v. Wiltberger*, 18 U.S. 76, 95–96 (1820) (emphasis added); *See also, N. Sec. Co. v. United States*, 193 U.S. 197, 358 (1904).

[50] Adjusted from $2,850 to $3,025 for cases filed after April 1, 2019.  *Compare* 11 U.S.C. § 104  (requiring the Judicial Conference of the United States to publish in the Federal Register the new 507(a) dollar amounts effective on April 1) *with* Notice re: Revision of Certain Dollar Amounts in the Bankruptcy Code Prescribed Under Section 104(a) of the Code, 84 Fed. Reg. 3488 (Feb. 12, 2019).

[51] *Deposit, Black's Law Dictionary* (11th ed. 2019) (emphasis in original).

The first and second definitions of deposit strike the Court as natural, ordinary readings of the term deposit used in the context of section 507(a)(7) with the first definition applying somewhat more naturally than the second. Under the first definition, a deposit is "the act of giving money to another who promises" (1) to preserve it or (2) to use it and return it in kind.[52] To return money in kind is to return it "[i]n goods or services rather than money."[53] Consequently, a deposit under § 507(a)(7) is naturally read to mean the giving of money to another who promises to use the money and return it in the form of goods or services. The Court finds this definition to most comfortably comport with a natural reading of the remaining terms in the statute.

Conversely, the third definition of deposit strikes the Court as unnatural in the context of the statute for two reasons. First, section 507(a)(7) priority protection extends only to unsecured claims while claims arising from deposits that are held in trust, given as pledges, or as security, are more likely to be secured claims than unsecured claims. Second, the third definition focuses on situations where the depositor forfeits money by failing to perform rather than the situations the consumer priority statute seeks to address where the depositor has a claim from the depositee's failure to perform despite the depositor's performance. As such, to force a reading of the term deposit used in section 507(a)(7) to require deposits to be held in trust, given as pledges, as security requirement,

---

[52] *Id.   United States v. Woods*, 571 U.S. 31, 45 (2013) ("[T]he operative terms are connected by the conjunction 'or.' . . . [That term's] ordinary use is almost always disjunctive, that is, the words it connects are to 'be given separate meanings.'") (citations omitted).

[53] *In Kind*, *Black's Law Dictionary* (11th ed. 2019).

or to be otherwise refundable almost certainly restricts the legislative intent expressed in the most natural reading of the words the legislature employed.[54]

The Court finds section 507(a)(7) to be unambiguous. Legislative intent is apparent from the natural reading of the statute. No examination of legislative history is required. Importantly, even if this statute were to be found to be ambiguous and the strict or narrow rule of construction for bankruptcy priority statutes were to apply, the above reading of the statute comports with a strict or narrow construction of the statute as it gives full force to the natural and ordinary meanings legislature's employed words.[55]

### 2. *A Cursory Examination of § 507(a)(7)'s Legislative History Confirms This Court's Reading*

Nevertheless, as courts disagree[56] about the circumstances under which consumer priority protection should be granted, and out of an abundance of caution, the Court will ensure that its reading does not "produce a result demonstrably at odds with the intentions of its drafters."[57]

The consumer priority statute was first introduced as House Bill 8200, was discussed on September 08, 1977 in House of Representatives Report 95—595 (the

---

[54] *See, e.g., United States v. Wiltberger*, 18 U.S. 76, 95–96 (1820) (emphasis added); *See also, N. Sec. Co. v. United States*, 193 U.S. 197, 358 (1904). While this definition does not require deposits to be refundable, the payments at issue are refundable as JetSuite was (i) required to refund the payments if it unilaterally terminated the Agreement and (ii) contractually obligated to use the money in exchange for its promise to return it to the 507 Claimants in the form of future air services.

[55] *Id.*

[56] For example, the *City Sports* and *WW Warehouse* courts disagreed as to whether the language of the consumer priority statute protects consumer gift card holders.

[57] *United States v. Ron Pair Enter. Inc.,* 489 U.S. 235, 242 (1989).

"Report"), passed, as amended, on November 6, 1978, effective on October 1, 1979, and codified at 11 U.S.C. § 507(a)(5).[58]  The statutory language passed in 1978 is virtually identical to the current § 507(a)(7).[59]  The Court will look to the Report as "the document[] prepared by Congress when deliberating."[60]

The legislative intent shown in the Report is in harmony with this Court's reading of the ordinary language of the statute.  The Report shows that Congress intended to modernize the bankruptcy priority statute to protect the priority of consumer creditors of a bankrupt business at a time when the amount and kinds of credit transactions were increasing.[61]  Congress specifically stated that its discussion of priorities "will not be exhaustive"[62] and highlighted several examples of types of consumer creditors that should be granted priority including those who: (i) pay money on layaway plans; (ii) pay

---

[58] *See generally*, H.R. REP. 95-595 (1978).  P.L. 95-598 (HR 8200), 92 Stat. 2541, § 401 (November 6, 1978) ("[T]his Act shall take effect on October 1, 1979.").  See 11 U.S.C. § 507(a)(5) (1982).

[59] Only the amount has changed pursuant to 11 U.S.C. § 104.

[60] *See e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 580 (1995) ("If legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating.").

[61] H.R. REP. 95-595, at p. 3−4, 188 (1978) ("The major purpose of this bill is the modernization of the bankruptcy laws.  The substantive law of bankruptcy and the current bankruptcy system was designed in 1898, in the horse and buggy era of the **consumer** and commercial **credit**, and was last overhauled in 1939, nearly 40 years ago.  It has only been since 1938 that **the consumer credit industry** has grown; and it has only been since the widespread adoption of the Uniform Commercial Code in the early 1960's that **commercial credit** has grown to its present magnitude . . . .  In order to remedy this problem and to reorganize the position of **consumer creditors** as different from that of business creditors, the bill provides a priority for **consumer creditors** of a bankrupt business.") (emphasis added).

[62] *Id.* at p. 174 (1978) ("The enormous increase in **the amount and kinds of credit transactions** that take place in our credit economy, the wide-spread adoption of the Uniform Commercial Code, and the general growth in the number and complexity of businesses seeking bankruptcy relief necessitate a **modernization** of the substantive law.  The discussion in this chapter **will not be exhaustive**, but rather will highlight some of the more important changes proposed by the bill . . . .") (emphasis added).

money as deposits on goods; or (iii) buy service contracts, contracts for lessens or gym memberships.[63]

In short, Congress intended to protect the rights of unsecured consumer creditors from bankrupt businesses and the Court's understanding that the deposit of money under § 507(a)(7) constitutes the giving of money to another who promises to use the money and return it in the form of goods or services does not "produce a result demonstrably at odds with the intentions of its drafters."[64]

### 3. Consumers' Prepurchase Payments Under the Terms of the Agreement Constitute § 507(a)(7) Deposits.

The issue of what constitutes a deposit under 507(a)(7) has been widely discussed by courts.  Below are some of the cases mentioned by the parties in their briefs.

In *In re Salazar*, a family's full payment for the construction of a residential pool to a contractor who filed for bankruptcy prior to completing the pool was held to be a deposit under section 507(a)(7) because a deposit "may include the advance handing over of full payment for consumer goods or services"[65]

In *In re VVV Warehouse*, the Delaware bankruptcy court found that consumer purchases of gift cards were deposits under 507(a)(7) because the purchases were not

---

[63] *Id.* at p. 188 (1978) ("A consumer that **pays money** on a lay-away plan or **as a deposit** on merchandise, or that **buys** a *service contract* or a *contract for lessons* or a *gym membership*, is a general unsecured creditor of the business to which he has given his money . . . .") (emphasis added).

[64] *United States v. Ron Pair Enter. Inc.*, 489 U.S. 235, 242 (1989).

[65] *In re Salazar*, 430 F.3d 992, 994 (9th Cir. 2005).

"ultimate purchases," or, phrased another way, consumers were not just paying for gift cards but for the right to use the gift cards to purchase property from the seller.[66]

In *In re City Sports*, the Delaware bankruptcy court disagreed with its prior decision in *In re VVV Warehouse* finding that when money is contemporaneously exchanged for a gift card, the transaction is complete and is not a deposit under 507(a)(7).[67] Thus, consumers who contemporaneously receive a gift card at the time they pay for it are not entitled to consumer priority protection because the property they purchased—the gift card—has been delivered.[68]

In *In re Worley*, consumers' joined an energy providers budget program that allowed them to pay a fixed monthly fee credited towards their total fuel balance.[69] When the energy provider filed for bankruptcy protection, some consumers, despite making the monthly budget payments and having positive account balances did not receive their fuel deliveries.[70] The *Worley* court found that these budget payments were deposits under section 507(a)(7).[71] Crucially, the *Worley* court found that unlike the purchase of a gift card deemed by *City Sports* to be a "short transaction without a temporal relationship,"

---

[66] *In re VVV Warehouse, Inc.*, 313 B.R. 588, 595 (Bankr. D. Del. 2004); *see e.g., In re City Sports, Inc.*, 554 B.R. 329, 335 (Bankr. D. Del. 2016).

[67] *In re City Sports, Inc.*, 554 B.R. 329, 338 (Bankr. D. Del. 2016) ("In the case of a money order, a store credit, or a gift card, the transaction is complete once those instruments are issued. Therefore, those instruments do not come under the definition of "deposit," and section 507(a)(7) does not afford them priority status. The Court disagrees with the holding of *VVV Warehouse* in regard to the application of section 507(a)(7) to gift cards.").

[68] *Id.* at 335–36.

[69] *In re Worley & Obetz, Inc.*, 615 B.R. 752, 753–54 (Bankr. E.D. Pa. 2020).

[70] *Id.* at 754.

[71] *Id.* at 756–58.

the budget payments were open transactions that depended on the energy provider ultimately providing the fuel to the consumers during the heating season.[72]

In *In re Palmas*, individuals' membership deposit payments made to a club for membership were found not to be deposits under section 507(a)(7) because (i) they were not held in trust or treated as a security and (ii) the membership gave individuals the right to be club members—but not the right to (i) access club facilities or (ii) enjoy the goods or services provided by club facilities.[73]  Instead, to access facilities or enjoy facility goods or services club members were required to make separate, additional payments.[74]

In *In re Nittany*, an individual paid a retailer for a three-year right to (i) access a physical catalogue at a certain store and (ii) order goods from it.[75]  The court found the payment not to be a deposit because the individual's payment was not refundable, and the services were delivered as the individual's rights under the agreement vested immediately upon payment.[76]

The GUC Trustee, relies on the bankruptcy court decisions of *Palmas del Mar*, *Nittany*, and *City Sports*[77] to argue that the prepurchase payments are analogous to gift

---

[72] *Id.* at 757.

[73] *In re Palmas del Mar Country Club, Inc.*, 443 B.R. 569, 570–71 (Bankr. D.P.R. 2010).

[74] *Id.*  at 574–75.

[75] *In re Nittany Enterprises, Inc.*, 502 B.R. 447, 450, 453–54 (Bankr. W.D. Va. 2012).

[76] *Id.* at 456.

[77] *See* D.I. 307 p. 13–18.

card purchases or membership purchases and are not deposits because the consumer claimants' rights to use the flight services immediately vested.[78]

As a factual matter, the Court disagrees that the payments at issue are factually similar to standalone membership purchases or the purchase of gift cards.  Unlike the payments for club membership in *In re Palmas*, or the purchase of gift cards in *In re City Sports*, where payments was made in closed transactions and the gift cards or memberships had independent value as (i) membership granted to individuals the standalone right to be a member of the club and (ii) gift cards could be gifted, sold in secondary markets, redeemed for goods or services, or transferred, here, membership is provided as part of a dependent, open transaction and contains no independent value because it only serves to facilitate the fulfillment of JetSuite's obligations under the Agreement.[79]  The Court considers the *In re Nittany* case to be more similar to the purchase of services than a membership purchase.

Instead, the Court finds the facts and context of the case at hand to be similar to contracts for the provision of services.[80]  Here, consumer claimants paid for JetSuite's obligation to provide flight services at their convenience at locked-in contract prices.[81]  Thus, the consumer claimants' prepayments were made in the context of an open

---

[78] *Id.* at p. 17–18 ¶23.

[79] Agreement 3.0, *Terms and Conditions* (32) ("Member shall not re-market, transfer, assign, or otherwise re-sell any services provided by JetSuite Air . . . ."); Agreement 2.0, *Terms and Conditions* (32) (same); Agreement 1.0 *Terms and Conditions* (24) (same).

[80] Where a membership has no independent value, it will likely be a contract for the provision of services.

[81] *See supra* p. 3–4 and accompanying notes.

transaction, with JetSuite obligated to provide services or refund the prepayment upon its unilateral termination of the Agrement.[82]  The facts in *In re Salazar*, likewise, reveal an open transaction where a consumer made full payment to a service provider for its unfulfilled promise to provide services.  Similarly, in *In re Worley*, the budget payments at issue were found to be open transactions because the energy provider was under an ongoing obligation to deliver fuel to the consumers under the terms of the budget program.[83]  Similar facts in, *In re Nittany*, are dealt with differently.  In *Nittany*, an individual's payment for a merchant's promise to allow the individual the immediate and future right to access and order goods from a catalogue was not considered a deposit despite the fact that the transaction remained open due to the merchant's unfulfilled obligations.[84]

The *In re Nittany* court's decision rests on the assumption that the term deposit requires a **connotation** of "a temporal relationship between the time consideration is given and the time the right to use or possess is vested in the individual giving the consideration"[85]  This assumption is incorrect for because it unnecessarily restricts the plain and ordinary reading of the statute. [86]

---

[82] *Supra* note 11.

[83] *In re Worley & Obetz, Inc.*, 615 B.R. 752, 757 (Bankr. E.D. Pa. 2020).

[84] *In re Nittany Enterprises, Inc.*, 502 B.R. 447, 456–57 (Bankr. W.D. Va. 2012) (allowing the claim while denying priority).

[85] *Id.* at 455.

[86] *See, e.g.*, *United States v. Wiltberger*, 18 U.S. 76, 95–96 (1820) (emphasis added). *See also*, *N. Sec. Co. v. United States*, 193 U.S. 197, 358 (1904).

The ordinary language of section 507(a)(7) provides priority protection to the "allowed unsecured claims of individuals . . . arising from the deposit . . . of money in connection with the purchase . . . of property or . . . services . . . that were not delivered or provided."[87] The statute does not focus on when an individual's right to use or possess vests. Instead, the statute focuses on the purchase of property or services that were not delivered or provided. This focus supports an examination of a seller's obligation to deliver or provide over an examination of whether an individual's right to use or possess has vested.

The "vested rights" reading results in an artificial distinction between consumers who give money for both an immediate and future right to services (not a deposit), and those who give money for a future right, alone, to services (a deposit). For example, a consumer's payment for a year-long gym membership would not be a deposit despite the gym's immediate and future obligation to provide services, because the individual's right to use the gym facilities vests immediately upon payment. Yet, Congress specifically intended to provide priority protection for consumers who buy gym memberships.[88]

Thus, the Court rejects the "vested right" approach. Remember, a deposit under § 507(a)(7) is naturally read to mean the giving of money to another who promises to use the money and return it in the form of goods or services.[89] In line with this understanding of deposit, to determine whether goods or services were provided the focus should be on

---

[87] 11 U.S.C. § 507(a)(7).

[88] See *supra* note 63.

[89] See *supra* p. 8.

whether the service provider or merchant's obligations to provide services or deliver goods have been entirely fulfilled.  If obligations remain, the transaction is open and the payment is more likely to be a deposit under § 507(a)(7).

For the above reasons, the Court finds that the consumer claimants' prepayments were deposits under section 507(a)(7) because (i) the consumer claimants gave money to JetSuite for JetSuite's promise to return the money in the form of flight services and (ii) JetSuite failed to fulfill its obligation to provide services to the consumer claimants. Consequently, the GUC Trustee has failed to produce evidence sufficient to negate the validity of the consumer claimants' filed claims.

## C.  The Federal Excise Tax ("FET") Claims

The Burchard Group, in claim 119, attaches a record of its October 7, 2019, $107,500 wire transfer to JetSuite.[90]  The copies of the customer statement The Burchard Group provide show that only $100,000 of this transfer was applied to claimant's customer statement.[91]  Aki Korhonen, in claim 156 states that the basis of the claim is "[p]repaid fees for services and prepaid federal excise taxes."[92] Ernst Ohnell, in claim 245 states that the basis of the claim is for "prepaid flight time & tax."[93]  Together, claims 119, 156, and

---

[90] Claim 119, at p. 2, 6 https://cases.stretto.com/public/x069/10254/CLAIM/1025405022032005510000.pdf Last visited April 9, 2021.

[91] *Id.* at p. 11.

[92] Claim 156, at p. 2 https://cases.stretto.com/public/x069/10254/CLAIM/1025405282032423500000.pdf Last visited April 9, 2021.

[93] Claim 245, at p.2 https://cases.stretto.com/public/x069/10254/CLAIM/1025406232032708040000.pdf Last visited April 9, 2021.

245 represent requests for a refund of federal excise tax ("FET") that were prepaid but not utilized (the "FET Claims").

The GUC Trustee does not argue that the claimed FET payments were not paid — only that they do not need to be returned under the terms of the Agreement.[94] Essentially, the argument is that (i) these payments were made under the terms of the Agreement, (ii) under the terms of the Agreement, the FET payments do not become a part of a member's notional balance, and (iii) consumers were not entitled to flights for this amount or a refund of any portion of this amount if flights were not taken.[95] While the terms of the Agreement are not disputed, the Court must, nevertheless, interpret them to determine whether they are consistent with the GUC Trustee's reading.  Each of the three claimants entered into the same version of the Agreement which is governed by Texas law.[96]  In Texas, unambiguous contracts are construed as a matter of law.[97]

> A contract is considered ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one interpretation.  When construing a contract, the terms are typically given "their plain, ordinary, and generally accepted meaning." Courts may look to dictionaries to discern the meaning of a commonly used term that the contract does not define. An unambiguous document will be enforced as written.[98]

---

[94] D.I. 307 at p.4—5, 7.  JetSuite presented new versions of the agreement to consumers overtime.  *See, e.g.*, D.I. 307 at p.12 ¶12.

[95] *Id.*

[96] Agreement 2.0(31) ("shall be governed by and construed in accordance with the laws of the Texas, without giving effect to conflict of law principles.").

[97] *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017) ("We construe unambiguous contracts as a matter of law.") (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).

[98] *In re Davenport*, 522 S.W.3d 452, 456–57 (Tex. 2017)

Provisions of the Agreement relevant to the FET:

> **Payment:**
> Member is making a payment of (check one):
> $100,000 [$250,000, or $500,000] plus FET allowance, such payment to be treated as a Non-Refundable Pre-Purchase Payment . . . .
>
> **The Payment referenced under "Payment Information" on the following page is a Non-Refundable Pre-Purchase Payment . . . .**
>
> **Payment Information:**
> Please send wire or check inclusive of 7.5% Federal Excise Tax (FET) allowance in the amount of:
> For $100,000: $107,500.00
> For $250,000: $268,750.00
> For $500,000: $537,500.00[99]
>
> **a. Purchase.** To become a Member in the Program, Member must promptly deliver to JetSuite Air the funds necessary to establish a JetSuite SuiteKey account . . . . JetSuite Air shall create an account in the name of Member ("Account") . . . . However, JetSuite Air shall maintain a notional balance in the Member's Account equal to the Non-Refundable Pre-Purchase Payment minus the value of services performed and expenses and charges incurred . . . . 'Funds' refers only to the cash payment(s) made by Member.
>
> JetSuite Air hereby indemnifies Member from the 7.5% FET liability incurred under this Agreement, and shall pay any and all applicable FET as it is due on Member's behalf from the total prepayment amount. JetSuite Air shall absorb or retain any difference between the allowance and actual FET paid.[100]

---

[99] Agreements 1.0, 2.0, and 3.0 at p. 1–2.

[100] Agreements 2.0 and 3.0, *Terms and Conditions* (25); Agreement 1.0, *Terms and Conditions* (17) (same).

The Court finds the Agreement to be unambiguous.  The Agreement requires JetSuite to pay FET "as it is due on Member's behalf from the total prepayment amount"[101] and clarifies that a "Payment" is the amount of $100,000, $250,000, or $500,000 plus an FET allowance—of 7.5% of the specified payment amount and refers to this payment as a "Non-Refundable Pre-Purchase Payment."[102]  The term "total prepayment amount" must be synonymous.[103]

The Agreement further requires JetSuite to "create an Account in the name of the Member (the 'Account')"[104] and "maintain a notional balance in the Member's Account equal to the Non-Refundable Pre-Purchase Payment . . . ."[105]  Because the total prepayment amount is defined to be a specified amount plus the 7.5% FET allowance, JetSuite must maintain a notional balance in the name of each Member equal to the specified payment *and* the FET allowance.  Accordingly, the FET allowance the claimants paid must be included in their accounts' notional balances and is to only be accessed by JetSuite to pay the FET "as it is due on Member's behalf from the total prepayment amount."[106]

---

[101] Agreements 2.0 and 3.0, *Terms and Conditions* (25); Agreement 1.0, *Terms and Conditions* (17) (same).

[102] Agreements 1.0, 2.0, and 3.0 at p. 1–2.  The Agreement refers to the idea of the total prepayment amount with varying terms including: "the funds necessary to establish a JetSuite Account," "Member's funds," "notional balance," "Funds in the Account (whether actual or notional)," "Member's Account," "Intial [sic] Deposit," "Deposits," "Payment" "program funds," "required funds," etc.  *See generally* the Agreements.

[103] *See supra* note **Error! Bookmark not defined.**.

[104] Agreements, *Terms and Conditions* (2)(a).

[105] Agreements 1.0, 2.0, and 3.0 at (2)(a).

[106] Agreements 2.0 and 3.0, *Terms and Conditions* (25); Agreement 1.0, *Terms and Conditions* (17) (same).

Where a portion of claimants' FET allowance remains unused, the GUC Trustee has failed to "produce evidence sufficient to negate the prima facie validity of the filed claim."[107]  Because claimants' customer statements contain at least two types of funds: (i) those which claimants paid an FET allowance on, and (ii) those which claimants did not pay an FET allowance on—such as referral credits—the Court denies, in part, the Objection for type (i) funds, and grants, in part, the Objection for type (ii) funds.

### D. The Accounting Claims

#### a.  Claim 105—Freedman Trust Properties[108]

The Freedman Trust Properties ("Freedman") filed claim 105 for $80,000 and in support, provides a copy of its customer statement as of September 17, 2019.[109]  The statement shows a beginning balance of $97,857.49 as of August 31, 2018 and, after three trips, an end balance of $73,201.24 as of September 17, 2019.[110]

The GUC Trustee's original objection sought to reduce Freedman's $80,000 claim amount—as overstated by $15,476.36—to $64,526.64.[111]  Now the GUC Trustee seeks to further reduce the claim amount—as overstated by $41,770.50—to $38,229.50.[112]  The

---

[107] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992) (citations omitted).

[108] Claim 105  https://cases.stretto.com/public/x069/10254/CLAIM/10254051120322971800001.pdf. Last visited April 9, 2021.

[109] *Id.* at p. 6.

[110] *Id.*

[111] D.I. 307 at p. 6.

[112] *Id.*

GUC Trustee provides a copy of Freedman's customer statement as of April 28, 2020.[113] This copy shows a beginning balance of $97,857.49 as of April 29, 2019,  and, after seven trips and a $500 credit, an end balance of $38,229.50 as of April 28, 2020.[114]  The GUC Trustee represents that it spoke with a representative of the claimant and explained why Reorganized Debtor only owes claimant $38,229.50—not $80,000 and that the claimant's representative had no questions or comments in response to the GUC Trustee.[115]

The Court grants the GUC Trustee's Objection to claim 105 as it has satisfied its burden in showing that claim 105 was overstated by the amount of $41,770.50. Claim 105 is allowed as an unsecured claim in the amount of $38,229.50.

b.  Claim 119—The Burchard Group

The Burchard Group (the "Group") filed claim 119 for more than $106,000 and, in support, provided (i) a copy of its customer balance showing a total balance of $75,264.56, (ii) documents to show it incorrectly paid twice for the same flight; and (iii) records showing that JetSuite failed to account for $7,500 of the $107,500 claimant wired to JetSuite as an account deposit on October 8, 2019. [116]  The documents include email exchanges, a quote, records of a wire transfer, and copies of the customer statements (the

---

[113] D.I. 307 Exhibit 4 at p. 1.

[114] *Id.*

[115] D.I. 307 p. 7.

[116] Claim 119 and its supporting documents are located online in the form of an 11 page PDF document at: https://cases.stretto.com/public/x069/10254/CLAIM/10254050220320055100001.pdf  Last visited April 9, 2021.

"First Account") JetSuite sent to it on two different dates.[117] The $7,500 FET related portion of claim 119 is discussed in a later section.

The Group provides copies of its customer statement current as of March 12, 2019 and April 30, 2020.[118] On both dates, the customer statement was addressed to the Group on JetSuite letterhead.[119] Two facts from the March 12, 2019 copy are relevant. First, is a single charge on February 2, 2019 for a $24,075 flight from MIA to TJSJ under the description "15022804."[120] Second, is the total balance of the account as of March 12, 2019 of $20,245.14.[121] Likewise, two facts from the April 2020 are relevant. First, the statement reveals an April 29, 2019 beginning balance of $20,245.14.[122] Second, the statement ends on October 20, 2019, with a remaining balance of $75,264.56.[123]

Additionally, the Group provides a series of emails sharing the subject: "Partner Quote #15022804 | MIA–TJSJ | 2/2" between Denise Burchard and Anissa Godby, an account manager at JetSuite including a (i) 6:52 pm Jan 30th email from Ms. Godby to Ms. Burchard explaining that JetSuite is no longer available for flight to Puerto Rico (TJSJ) and that Ms. Godby's charter team is sourcing alternative options through its network,[124] (ii) 4:56 pm Jan 31st email from Ms. Godby attaching (a) a quote of $17,124 for a February 2nd

---

[117] *Id.* at p. 6–11.

[118] *Id.* at p. 7, 11.

[119] *Id.*

[120] *Id.* at p. 7.

[121] *Id.*

[122] *Id.* at p. 11.

[123] *Id.*

[124] *Id.* at p. 9.

flight from MIA to TSJS[125] and (b) Ms. Godby's request that Ms. Burchard "send separate payment since we are not operating the trip ourselves—and SuiteKey funds are reserved for in fleet trips,"[126] and (iii)  7:49 pm January 31, 2019 email from Ms. Burchard to Ms. Godby stating: "I'll get the wire scheduled right now to Jetsuite in the instructions in the pdf below and send you the confirmation email."[127]   Immediately afterward, Ms. Burchard forwarded the confirmation email to Ms. Godby with the subject line: "Funds Transfer Request #253923988 Has Been Scheduled" to which Ms. Godby responds "[t]his is perfect."[128]  Moreover, the Group attaches to the claim a quote dated January 31, 2019, made on JetSuite letterhead.[129]   The quote is quote number 15022804, and details a February 2, 2019 trip from Miami, Florida (KMIA) to San Juan (TJSJ) for $17,124.[130] Finally, the Group provides a record of its wire transfer to JetSuite on February 1, 2019 for $17,124.[131]

The GUC Trustee, after reviewing the Reorganized Debtor's books and records discovered that the Group had not one account—but at least two.[132] The first account is reflected in the copies of the customer statements the Group provided.  The second

---

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *Id.* at p. 10.

[129] *Id.* at p. 8.

[130] *Id.* at p. 8.

[131] *Id.* at p. 6.

[132] *See, e.g.,* D.I. 307 at p.8 ("[A]dd $17,823.97 for the balance of the claimant's second account . . . ."); *id.* Exhibit 5 at p. 2 (indicating there may be charges to old accounts that the current customer statement fails to account for.).

account, current as of April 28, 2020, contains an additional balance of $17,823.97 which results from the following: (i) a December 31, 2018 beginning balance of $199.97, (ii) a deposit on February 1, 2019, of $17,124, and (iii) a $500 flight credit added on February 1, 2020.[133]

In addition, the GUC Trustee provides a copy of the first account, current as of April 28, 2020, according to JetSuite's books and records.  The GUC Trustee's copy, with a total balance of $75,264.56 — the equivalent balance of the customer statement The Burchard Group provided, (i) appears to have begun on January 31, 2019, (ii) fails to include a charge of $24,075, but does include a March 13, 2019 "Transfer to Old Account" in the amount of $56,890.28, and (iii) ends with a total balance of $75,264.56.[134]

The facts paint the compelling picture that on February 1, 2019, the Group wired $17,124 to JetSuite for a February 2, 2019 flight from Miami to Puerto Rico in accordance with the terms of quote number 15022804 and on February 2, 2019, JetSuite charged the Group's customer account $24,075 for what appears to be the same trip.   The Group's evidence provides strong support for concluding that  it was incorrectly charged $24,075 for a flight that it already wired, in full, to JetSuite in the amount of $17,124.  The GUC Trustee has failed to produce evidence that negates the validity of the Group's claim that (i) it should have paid $17,124, not $24,075 for the flight and (ii) it wired $17,124 to JetSuite.

---

[133] D.I. 307 Exhibit 5 at p. 1.

[134] *Id.* at p. 2.

The Group is entitled to an allowed claim of $100,039.53 for the double charge. To calculate this amount, (i) add the second account balance of $17,823.97 to the first account balance of $75,264.56; (ii) subtract $17,124 from the result; and (iii) add $24,075. Thus, the Court, without considering the FE portion of the claim, denies the GUC Trustee's Objection and finds that claim 119 is allowed in the amount of $100,039.53.

c.   Claim 290—Estate of David P. Cradick

The Estate of David P. Cradick (the "Estate") filed a claim in the amount of $6,571.29 on behalf of the decedent.[135] The Estate does not attach any documents in support of the amount of the claim.[136] The GUC Trustee attaches a customer statement made to David Cradick as of April 28, 2020 showing a remaining balance of $3,571.29.[137] The GUC Trustee does not argue that future services are non-transferrable.[138] The Court finds that The GUC Trustee has met the required burden of proof. Claim 290 is adjusted to a total amount of $3,571.29.

## CONCLUSION

The Court grants the GUC Trustee's Objection to claims 105 and 290. Claim 105 is allowed as an unsecured claim in the amount of $38,229.50. Claim 290 is allowed as an unsecured claim in the amount of $3,571.29.

---

[135] Claim 290 at p. 2 https://cases.stretto.com/public/x069/10254/CLAIM/10254062320327072500001.pdf Last visited April 9, 2021.

[136] *Id.*

[137] D.I. 307

[138] *Id.* at p. 9 table.

The Court denies the GUC Trustee's Objection to the accounting related amount of Claim 119. The accounting portion of Claim 119 is allowed in the amount of $100,039.53.

The Court denies the GUC Trustee's Objection to the FET portion of claims 119, 156, and 245 and allows the FET portion of these claims up to the full extent of prepaid, but not incentive, funds remaining in the FET claimants' notional balances.

The Court denies the GUC Trustee's Objection to the 507 Claims and allows them as priority unsecured claims under 11 U.S.C. § 507(a)(7) up to $3,025 cap per claimant.

The Court directs the Reorganized Debtor to submit a proposed order under certification of counsel reflecting the Court's ruling.